IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EPIC SYSTEMS CORPORATION                          OPINION AND ORDER

                     Plaintiff,                                    15-cv-179-bbc

          v.

ATTACHMATE CORPORATION,

                     Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Epic Systems Corporation filed this civil action against defendant Attachment Corporation after defendant accused plaintiff of facilitating wide-spread unauthorized use of certain Attachmate software. Plaintiff is seeking a declaration that its use of the Attachmate software did not violate either defendant's copyrights or the parties' licensing agreements. Plaintiff also included claims that defendant's sales practices violated the Wisconsin Deceptive Trade Practices Act and that defendant's audit and subsequent accusations of unauthorized use violated the implied duty of good faith and fair dealing under Washington state law. Defendant responded in kind by filing counterclaims for copyright infringement and breach of contract.

Three motions are before the court. First, plaintiff has filed a motion for summary judgment on defendant's breach of contract and copyright claims. Second, defendant has filed a motion for partial summary judgment on plaintiff's claims for breach of the duty of good faith and fair dealing and violations of Wisconsin's Deceptive Trade Practices Act.

Third, defendant has filed a motion to strike or disregard various declarations, deposition excerpts and an expert report submitted by plaintiff in support of its motion for summary judgment.

I am denying in part and granting in part plaintiff's motion for summary judgment on defendant's breach of contract claims.  Defendant has presented sufficient evidence to create a genuine issue of material fact with respect to whether plaintiff breached the use, monitoring, control and reporting provisions in the parties' licensing agreements.  I also conclude that a reasonable jury could find that defendant suffered damages as a result of this unauthorized use.  However, I disagree with defendant that by allowing its customers to use the software, plaintiff breached the licensing agreement's "rental" provisions. Finally, a reasonable jury could find that plaintiff violated defendant's copyrights by installing defendant's software on plaintiff's extranet servers without authorization for that particular type of installation.

I am denying defendant's motion for summary judgment with respect to plaintiff's claim that defendant breached the duty of good faith and fair dealing.  A reasonable jury could find that defendant breached the duty of good faith and fair dealing by allowing plaintiff to engage in a particular type of use not explicitly authorized under the licensing agreement so that defendant could later audit plaintiff and demand exorbitant licensing fees plaintiff would not have otherwise paid.  I am also denying defendant's motion for summary judgment as to plaintiff's Wisconsin Deceptive Trade Practices Act claim because a reasonable jury could find that defendant made untrue representations regarding the scope

of the software licenses at issue in order to sell them to plaintiff.

Finally, I am denying defendant's motion to strike as moot.  In ruling on the parties' motions for summary judgment, I did not need to consider or rely on the testimony of those individuals whose testimony defendant wants stricken.

From the parties' proposed facts, I find that the following are relevant and not genuinely disputed.

UNDISPUTED FACTS

Plaintiff Epic Systems Corporation is a Wisconsin corporation involved in the development and sale of software used to manage healthcare records.  Its principal place of business is Verona, Wisconsin.  Defendant Attachmate is a Washington corporation with its principal place of business in Seattle, Washington.  Defendant sells and licenses various types of software, including "terminal emulation software," which enables users of one type of computer operating system to access information maintained on a different type of computer operating system.  For example, in the context of a Windows-based operating system, one might use terminal emulation software to access information stored on a Unix or IBM operating system from a Windows computer.  Many companies that store information on mainframe computers will use terminal emulation software to enable their employees or customers to access this information from their desktops, laptops or mobile devices.

Defendant has developed a variety of terminal emulation programs, four of which are

3

at issue in this case: Reflection for the Web ("RWeb"); Reflection for Unix and OpenVMS version 14.0 ("RUO v. 14.0"); Reflection for Unix and Open VMS version 14.1 ("RUO v. 14.1"); and Extra! X-treme version 9.3 ("EX v. 9.3"). These programs are all similar in the sense that they enable users to communicate with plaintiff's operating systems from desktop computers or the users' mobile devices. Defendant owns copyright registrations for RUO v. 14.0, EX v. 9.3 and RUO v. 14.1. (Defendant does not identify a copyright registration for RWeb).

Prior to March 2011, plaintiff was using "Esker SmarTerm" terminal emulation software so that plaintiff's customers could access its internal network for training. In February 2011, however, plaintiff and defendant began discussing whether defendant's terminal emulation software was suitable for plaintiff's needs and could be deployed in place of SmarTerm. Plaintiff explained to defendant that it needed terminal emulation software so that certain employees of its customers (hospitals and healthcare providers) could train on plaintiff's software, which requires the ability to communicate with plaintiff's systems. Plaintiff also explained that it conducted training both "on-site" at its facility in Wisconsin and remotely via its extranet.

After meeting with defendant's representative, Bob Babai, and evaluating the different products defendant offered, plaintiff determined that RUO v. 14.0 was the best fit for its purposes and agreed to buy licenses for that program. Plaintiff's original intent was to purchase "concurrent" licenses for RUO v. 14.0. Concurrent licenses would have allowed any individual in plaintiff's organization to access RUO v. 14.0 from any device so long as

4

the maximum number of individuals using the program at any given time did not exceed the total number of concurrent licenses.  However, Babai told plaintiff that it did not license RUO v. 14.0 on a concurrent basis, so plaintiff had to purchase "device-based" licenses, which, as the name suggests, requires the licensee to purchase a license for each individual device that might be used to access the program.

Plaintiff was willing to purchase device-based RUO v. 14.0 licenses for all of the devices at its training facility, which it did on a number of occasions between March 2011 and March 2014.  Ultimately, plaintiff acquired 10,930 device-based RUO v. 14.0 licenses, which it used to install RUO v. 14.0 on various computers and devices at its training center. In addition, plaintiff installed RUO v. 14.0 on approximately 50 servers used to provide access to its extranet.  However, it was not feasible to purchase device-based RUO v. 14.0 licenses for all of the devices used by all of the individuals that needed to access plaintiff's training system remotely via its extranet.  To provide these individuals access, plaintiff purchased licenses for RWeb, a slightly different terminal emulation program, which defendant was willing to license on a concurrent basis.

At some point between March 2011 and March 2014, defendant began licensing RUO v. 14.0 on a concurrent basis.  When plaintiff realized this in March 2014, it exchanged its concurrent RWeb licenses for concurrent RUO v. 14.0 licenses.  Plaintiff was charged approximately $95,000 for this exchange.  Thus, as of March 2014, Plaintiff had 10,930 device-based RUO v. 14.0 licenses and 400 concurrent RUO v. 14.0 licenses.  The former were used for on-site training and the latter were used for remote training through

5

plaintiff's extranet.

In late 2014, defendant retained Deloitte & Touche to conduct an audit of Plaintiff's software systems to determine whether plaintiff was complying with the parties' licensing agreements.  The audit indicated that plaintiff had "over-deployed" defendant's software in violation of the parties' licensing agreements.  In particular, the audit indicated that more than 190,000 individual users—essentially everyone with an Epic extranet account—had the ability to access RUO v. 14.0 via plaintiff's extranet. The audit also suggested that plaintiff had installed RUO v. 14.1 and EX 9.3 on employees' devices without authorization from defendant.  Defendant confronted plaintiff and claimed that this "over-deployment" violated the parties' licensing agreement.


OPINION

I. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

A. Breach of Contract

Plaintiff has moved for summary judgment on defendant's breach of contract claims, which the parties agree are governed by Washington law in accordance with the parties' licensing agreements.  Under Washington law, a plaintiff asserting breach of contract must establish: (1) the existence of a valid contract; (2) breach of that contract; and (3) damages resulting from the breach.  Karpenski v. American General Life Companies, LLC, 999 F. Supp. 2d 1235, 1250 (W.D. Wash. 2014) (citing Fidelity & Deposit Co. of Maryland v. Dally, 148 Wash. App. 739, 201 P.3d 1040, 1044 (2009)).  Defendant contends that

6

plaintiff breached various provisions in licensing agreements related to three separate software programs: (a) the RUO v. 14.0 licensing agreement; (b) the RUO v. 14.1 licensing agreement; and (c) the EX v. 9.3 licensing agreement.

### 1. The RUO v. 14.0 licensing agreement

Plaintiff's arguments for its entitlement to summary judgment on defendant's claim that plaintiff breached the RUO v. 14.0 licensing agreement fall into three general categories. First, plaintiff contends that it did not breach any provision in the RUO v. 14.0 licensing agreement. Second, plaintiff contends that even if it did breach the RUO v. 14.0 licensing agreement, defendant's claim fails because defendant did not incur any damages as a result of the breach. Third, plaintiff contends that the claim is barred by the equitable doctrines of laches and estoppel.

### a. Breach

The first issue with respect to the RUO v. 14.0 licensing agreement is whether plaintiff breached the agreement. Defendant argues that plaintiff breached five provisions of the licensing agreement: (1) Section 1 (including the incorporated product use appendix), which governs plaintiff's right to "use" the program; (2) Section 2.C., which prohibits the rental, lease, sale or sublicensing of the RUO 14.0 program without defendant's permission; (3) Section 4.A., which requires plaintiff to implement safeguards against unauthorized use; (4) Section 4.B., which requires plaintiff to keep records relating to use; and (5) the

concurrent license provision requiring plaintiff to monitor, control and report on concurrent usage.

### 1) section 1 "use" restrictions

First, defendant claims that plaintiff breached the RUO v. 14.0 licensing agreement by installing RUO 14.0 on its servers and "deploying" the program in such a way that approximately 190,000 of plaintiff's extranet users could access RUO v. 14.0. Defendant contends that this "deployment" violated Section 1, which governs the scope of plaintiff's license and provides as follows:

> Subject to payment of applicable license fees, Licensor and its suppliers grant you a non-exclusive, non-transferable license to use [RUO v. 14.0] for internal business purposes. . . . For purposes of this Agreement, [RUO 14.0] is "used" when the software or any component of the software is installed or loaded in the temporary or permanent memory of a computer or otherwise accessed.

The "Product Use Rights" set forth in the appendix to the RUO v. 14.0 licensing agreement are also relevant to defendant's contention that plaintiff violated Section 1's use restrictions. These use rights provide that the plaintiff "must acquire and dedicate a desktop license for each single computer on which [RUO v. 14.0] is 'used.'"

It is undisputed that plaintiff "deployed" RUO v. 14.0 in such a way that approximately 190,000 of its extranet users could access RUO v. 14.0. However, I am not persuaded by defendant's argument that the licensing agreement is to be interpreted as requiring plaintiff to purchase a separate license for each individual that *could*, rather than *did*, access RUO v. 14.0. By its express terms, the licensing agreement prohibits unlicensed

8

"use," which occurs only when "the software or any component of the software is installed or loaded in the temporary or permanent memory of a computer or otherwise accessed." Thus, in order to establish that plaintiff violated the licensing agreement's use provisions, at a minimum, defendant must show that at least some of plaintiff's 190,000 extranet users actually accessed the program from unlicensed devices.

Plaintiff argues that defendant has failed to identify a single user that actually accessed RUO v. 14.0 through plaintiff's extranet during the relevant time period.  This may be true, but it is clear from the parties' briefs and materials that such access did occur, at least to some extent.  Plaintiff does not contend that none of its 190,000 extranet users accessed RUO v. 14.0 between March 2011 and March 2014.  To the contrary, plaintiff says that it was monitoring concurrent use of RUO v. 14.0 between March 2011 and March 2014 to ensure compliance with its concurrent RWeb licenses.  Of necessity, this implies that there were individuals accessing RUO v. 14.0 remotely throughout that time period. The extent to which these 190,000 extranet users may have accessed RUO v. 14.0 will have to be addressed at trial, but it is clear that at least some of the 190,000 extranet users did access RUO v. 14.0 between 2011 and 2014.

Next, plaintiff argues that it did not breach the licensing agreement's use provision, as shown by defendant's lack of any evidence that more than 390 individual users accessed RUO v. 14.0 at any given time.  However, this argument assumes that the 400 concurrent RWeb licenses plaintiff purchased in 2011 authorized it to use RUO v. 14.0 on a concurrent basis.  Because the parties' evidence on this point is conflicting, this issue will need to be

9

resolved by a jury.  If the parties agreed that by purchasing concurrent RWeb licenses in 2011, plaintiff could access RUO v. 14.0 on a concurrent basis, plaintiff will be entitled to judgment in its favor unless defendant can demonstrate that at some point more than 400 individuals were using RUO v. 14.0 via plaintiff's extranet.

2) section 2.C. "rental" restrictions

Next, defendant contends that plaintiff's "deployment" of RUO v. 14.0 breached Section 2.C. of the RUO 14.0 licensing agreement, which specifies that plaintiff "may not rent, lease, sell, sublicense or lend" RUO v. 14.0.  I conclude that this claim fails.  Even if all of the 190,000 individuals used RUO v. 14.0, they were not "renting" or "leasing" the software by doing so.

When interpreting a contract under Washington law, words must be given their ordinary meaning.  Cambridge Townhomes, LLC v. Pacific Star Roofing, Inc., 166 Wash. 2d 475, 487, 209 P.3d 863 (2009).  The ordinary meaning of the word "rent" is to pay someone for the right to use that person's property for one's own purposes.  Here, plaintiff's customers' use of RUO v. 14.0 was incidental to their use of plaintiff's training software. They did not pay for the right to use RUO v. 14.0; they paid for the right to use plaintiff's software.  Moreover, there is no evidence suggesting that plaintiff's customers could use RUO v. 14.0 for their own business purposes.  Defendant's attempt to characterize these individuals' use of RUO v. 14.0 as "renting" the software is premised on an unreasonable interpretation of what it means to rent an item.  Accordingly, even if plaintiff's customers'

employees used RUO v. 14.0 without a license, their doing so did not violate the "rental" provision in the RUO v. 14.0 licensing agreement.

### 3) sections 4.A. and 4.B. - safeguards and record-keeping

Defendant also contends that plaintiff breached Sections 4.A. and 4.B. of the licensing agreement, which require plaintiff to "implement internal safeguards" to prevent unauthorized use and to keep records relating to plaintiff's installation, copying and use of RUO v. 14.0.  A genuine dispute exists with respect to whether plaintiff complied with these requirements.  Although it is undisputed that plaintiff kept certain records related to its installation and use of RUO v. 14.0 and implemented some types of "internal safeguards" to prevent unauthorized use, defendant argues that these safeguards and records were not sufficient.  The licensing agreement is ambiguous on this point because of its silence with respect to the type of internal safeguards plaintiff was expected to implement or the types of records they were expected to keep.  Harding v. Warren, 30 Wash. App. 848, 850, 639 P.2d 750, 752 (1982) ("A written instrument is ambiguous when its terms are uncertain or susceptible to more than one meaning.").  Contractual ambiguities present questions of fact that must be resolved by looking to, among other things, "the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of [the] respective interpretations advocated by the parties."  Nicholson v. Thrifty Payless, Inc., No. C12-1121-RSL, 2014 WL 618775, at *5 (W.D. Wash. Feb. 18,

11

2014) (quoting <u>Stender v. Twin City Foods, Inc.</u>, 82 Wash. 2d 250, 254, 510 P.2d 221 (1973)). Until this can be done, I cannot conclude that plaintiff is entitled to summary judgment on defendant's claim that plaintiff breached the record-keeping and safeguard provisions in the licensing agreement.

### 4) section 4.C. - monitoring concurrent use

Finally, defendant contends that plaintiff violated the product use appendix by failing to (1) acquire enough licenses to cover "the maximum number of users who could use or access the software concurrently;" and (2) "monitor, control and report on concurrent usage." Unlike defendant's other contentions, these contentions relate to plaintiff's use of RUO v. 14.0 after it acquired concurrent licenses in 2014.

Defendant's claim that plaintiff breached the RUO v. 14.0 licensing agreement by not acquiring licenses for the maximum number of users who could use or access RUO v. 14.0 concurrently fails because, again, plaintiff was not required to purchase licenses for all those individuals who *could* access the software concurrently. Such an interpretation is inconsistent with the concurrent licensing model set out in the product use rights appendix, which requires a licensee to purchase only enough licenses to cover expected peak concurrent use. In other words, plaintiff was not required to purchase 190,000 concurrent licenses simply because it was theoretically possible that plaintiff's 190,000 extranet users could access RUO v. 14.0 at the same time. Instead, plaintiff had to purchase only enough licenses to cover the number of users that *actually* accessed RUO v. 14.0 concurrently.

However, there is a genuine dispute with respect to whether plaintiff properly monitored, controlled and reported on concurrent use. Although the appendix requires plaintiff to "monitor, control, and (on request of [defendant]) report on concurrent usage by product and version," it does not identify the specific means by which this is to be accomplished. Given the ambiguity inherent in the product use appendix and the parties' disagreement regarding how to effectively monitor concurrent use of RUO v. 14.0, it is not possible to say at this time whether plaintiff is entitled to summary judgment on defendant's claim that it breached its monitoring, control and reporting obligations.

b. Damages attributable to breach of RUO v. 14.0 licensing agreement

In addition to arguing that it did not breach the licensing agreement, plaintiff argues that even if it did, defendant's breach of contract claim fails because defendant has not suffered damages attributable to such a breach. This argument is fundamentally flawed.

Plaintiff contends that defendant did not suffer any damages "resulting from Epic's use from 2011 to 2014, because Plaintiff swapped out its 400 concurrent RWeb licenses and paid the difference for 400 concurrent RUO licenses in March 2014." Plf. Br. Summ. J. 11, dkt. #65. As plaintiff notes, this argument is, in essence, an argument that defendant's claims are barred by the doctrine of accord and satisfaction, id. at 15, which applies when there is: (1) a bona fide dispute; (2) an agreement to settle that dispute; and (3) performance of that agreement. St. Hilaire v. Food Services of America, Inc., 82 Wn. App. 343, 353, 917 P.2d 1114 (Wash Ct. App. 1996). Such an argument fails because it is not

13

clear from the record whether plaintiff's March 2014 payment was intended to settle the parties' dispute regarding plaintiff's alleged unauthorized use of RUO v. 14.0, or whether it was simply what it cost plaintiff to swap its RWeb licenses for RUO v. 14.0 licenses and use the latter on a concurrent basis going forward.

However, I agree with plaintiff that defendant's damages theory and its proposed method for calculating damages is dubious.  First, defendant's demand for $66,000,000 assumes that it is entitled to damages for each individual that *could have* accessed RUO v. 14.0.  However, as discussed above, simply providing access to an unlicensed individual is not a violation of the licensing agreement if that individual never actually used the program. Accordingly, defendant's recovery, if any, will be based on the number of individuals that actually accessed RUO v. 14.0 without a license.  To the extent that plaintiff disagrees with defendant's damages theory—that damages should be calculated on the basis of the number of unauthorized users multiplied by the cost of a "device-based" license—this issue can be raised in a motion in limine prior to trial.


c. Affirmative defenses raised by plaintiff

Plaintiff also claims that defendant's breach of contract claim is barred by the doctrines of laches and equitable estoppel.  I conclude that neither of these equitable defenses provides a basis for entering summary judgment in plaintiff's favor.

1) laches

Under Washington law, a party generally cannot invoke the doctrine of laches to bar a claim when that claim was brought within the applicable statute of limitations.  Brost v. L.A.N.D., Inc., 37 Wash. App. 372, 375, 680 P.2d 453 (1984).   Plaintiff does not argue that defendant failed to file its breach of contract claim within the applicable statute of limitations.  Instead, plaintiff contends that this is an exceptional case because of the amount of money at issue.  However, plaintiff fails to cite any authority in support of the proposition that the amount of money at issue has any relevance to determining whether laches can be invoked to bar a claim brought within the applicable limitations period.

2) equitable estoppel

Plaintiff fares no better with its argument that defendant's breach of contract claim is barred by the doctrine of equitable estoppel.  Equitable estoppel applies when: (1) a plaintiff makes an admission, statement or act inconsistent with a claim afterwards asserted; (2) a defendant acts in reliance on such admission, statement or act; and (3) the defendant is injured as a result of the plaintiff's being allowed to contradict or repudiate such admission, statement or act.  Dombrowsky v. Farmers Insurance Co., 84 Wn. App. 245, 256, 28 P.2d 1127 (Wash. Ct. App. 1996).  Plaintiff fails to satisfy the first element of this three-part test.  Plaintiff does not identify any affirmative "admission, statement or act" inconsistent with defendant's claim that plaintiff over-deployed the RUO v. 14.0 program.  The only "act" that plaintiff identifies is defendant's failure to provide plaintiff guidance

15

about its expectations for plaintiff's monitoring of concurrent use.  Assuming this is true, defendant's failure does not qualify as "an admission, statement or act" that the manner in which plaintiff monitored use was appropriate under the contract.  Plaintiff fails to cite any authority to support the proposition that a party's silence can qualify as an affirmative admission, statement or act that the opposing party's conduct is acceptable.

### 2. RUO v. 14.1 licensing agreement

Defendant's audit revealed that plaintiff had installed RUO v. 14.1, a later version of RUO v. 14.0, on 22 devices without paying licensing fees.  Plaintiff argues that 22 of the 10,930 device-based RUO licenses it bought between 2011 and 2014 covered these 22 installations. However, it is not clear from the record whether the 10,930 RUO v. 14.0 device-based licenses plaintiff purchased also authorized plaintiff to install and use RUO v. 14.1.  If operating RUO v. 14.1 requires an RUO v. 14.1 license, it is irrelevant whether plaintiff had 10,930 RUO v. 14.0 licenses.  Whether plaintiff's RUO v. 14.0 licenses covered RUO v. 14.1 installations will have to be resolved at trial.

### 3. EX v. 9.3 licensing agreement

Defendant also contends that plaintiff breached the standard licensing agreement for EX v. 9.3 by loading it onto one computer without paying licensing fees.  It is undisputed that plaintiff never purchased a license for the EX v. 9.3, but plaintiff contends that it was not required to do so because the single copy identified during the audit was an "evaluation"

16

version that it was allowed to download and use on a temporary basis without having to pay licensing fees.  Defendant denies this and argues that if the copy had been an evaluation version, the file name would have identified it as such.  Accordingly, there is a genuine dispute of material fact with respect to whether plaintiff was required to purchase a license for the single copy of EX v. 9.3 it downloaded.


B. Copyright Infringement

Defendant's copyright infringement claim requires it to demonstrate that (1) it owned valid copyrights for the software; and (2) plaintiff copied original elements of the software without permission.  Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991).  It is undisputed that defendant had valid copyrights for all of the software at issue. However, plaintiff contends that there is no evidence of its having created copies of RUO v. 14.0 without authorization.  This is an issue that cannot be resolved on summary judgment.

I agree with plaintiff that neither it nor its customers infringed the RUO v. 14.0 copyright merely by accessing the program via plaintiff's extranet.  However, defendant also contends that plaintiff did not have permission to install copies of RUO v. 14.0 on its extranet servers, which in turn gave plaintiff's extranet users permission to access the program.  If the facts presented at trial establish that the parties' agreement authorized plaintiff to install RUO v. 14.0 on individual desktops and mobile devices, but did not authorize plaintiff to install RUO v. 14.0 on extranet servers, plaintiff's installation could

17

constitute infringement.  See Saks v. Attachmate Corp., 14-cv-4902, 2015 WL 1841136, at *11 (S.D.N.Y. Apr. 17, 2015) ("But making an unauthorized copy of the EMSE TES by installing it on a network server without permission IS an infringing act—it is the making of an unlicensed copy, because the precondition to copying under the license was obtaining enough certificates to cover all 'accessible' devices.").

## II. ATTACHMATE'S MOTION FOR SUMMARY JUDGMENT

### A. Good Faith and Fair Dealing

In count V of plaintiff's complaint, plaintiff contends that defendant breached the duty of good faith and fair dealing underlying the parties' RUO v. 14 licensing agreement.

 Under Washington law, which the parties agree applies to this claim, the duty of good faith and fair dealing is an implied covenant in every contract.  Miller v. Othello Packers, Inc., 67 Wash. 2d 842, 844, 410 P.2d 33 (1966).  Good faith and fair dealing has no one-size-fits-all definition.  "[T]he duty varies somewhat with the context in which it arises." Microsoft Corp. v. Motorola, Inc., 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013).  For example, under the Restatement (Second) of Contracts, which Washington courts cite in defining the contours of the duty of good faith and fair dealing, id. n.4, a party may violate the duty of good faith and fair dealing if it: (1) evades the spirit of a bargain; (2) willfully renders imperfect performance; (3) interferes with or fail to cooperate in the other party's performance; (4) abuses discretion granted under the contract; or (5) performs the contract without diligence.  Id. § 205 cmt. d.  Although the ways in which a party may violate the

duty of good faith are potentially innumerable, the Washington courts have held consistently that the duty "only exists in relation to the performance of specific contract terms." Keystone Land & Development Co. v. Xerox Cop., 152 Wash. 2d 171, 94 P.3d 945, 949 (2004).

Defendant moved for summary judgment on the ground that plaintiff could not identify with specificity the manner in which defendant violated its duty of good faith and fair dealing under the parties' contract.  Plaintiff responded by enumerating a variety of ways in which defendant allegedly violated the duty.  In general, plaintiff contends that defendant understood plaintiff's need for concurrent licenses at the outset of the parties' agreement, represented that concurrent RWeb licenses could be used to access RUO v. 14.0 on a concurrent basis and allowed such use for many years, and then alleged wide-spread non-compliance based on an unreasonable interpretation of the licensing agreement. Although defendant disputes the factual premises for many of these allegations, if they are proved, they would constitute sufficient evidence to enable a reasonable jury to conclude that defendant breached its duty of good faith and fair dealing.

### B. Wisconsin Deceptive Trade Practices Act

Defendant has also moved for summary judgment on plaintiff's claim that defendant violated Wisconsin's Deceptive Trade Practices Act, Wis. Stat. § 100.18.  A claim under the Deceptive Trade Practices Act requires a plaintiff to establish three elements: (1) the defendant made a representation to the public with the intent to induce an obligation; (2)

the representation was untrue; and (3) the representation caused plaintiff pecuniary loss. K & S Tool & Die Corp. v. Perfection Machine Sales, Inc., 2007 WI 70 ¶ 19, 301 Wis. 2d 109, 732 N.W.2d 792. Defendant argues that plaintiff has failed to create a genuine issue of material fact with respect to the first and second elements of plaintiff's Wisconsin Deceptive Trade Practices Act claim.

Defendant argues that the alleged misrepresentations at issue were not directed at a member of "the public" as that term has been construed by Wisconsin's courts. A plaintiff is a member of the public under Wisconsin law unless it has a "particular relationship" with the defendant. State v. Automatic Merchandisers of America, Inc., 64 Wis. 2d 659, 664, 221 N.W.2d 683 (1974). The only instance in which the Wisconsin courts have found a "particular relationship" was when the parties had entered into a contract that pre-dated the alleged misrepresentation at issue in the case. Kailin v. Armstrong, 252 Wis. 2d 676, 709-10, 643 N.W.2d 132 (Wis. App. 2002). See also Uniek, Inc. v. Dollar General Corp., 474 F. Supp. 2d 1034, 1039-40 (W.D. Wis. 2007) (finding particular relationship in light of parties' thirteen year relationship under a "letter of understanding"). Here, defendant's alleged misrepresentations—that concurrent RWeb licenses provided concurrent access to RUO v. 14.0—were made at the outset of the parties' contractual relationship and were intended to induce plaintiff to purchase defendant's software. (Defendant contends in its brief that the parties' relationship began many years prior to the alleged misrepresentations at issue, but the proposed fact supporting this contention is based on allegations in its complaint, which, as plaintiff points out, the court cannot consider as fact at the summary

20

judgment stage.)  Accordingly, there is a genuine dispute of material fact with respect to whether plaintiff was a member of the public.

Plaintiff has also set forth sufficient evidence to enable a reasonable jury to find that defendant misrepresented whether its concurrent RWeb licenses allowed plaintiff to use RUO v. 14.0 on a concurrent basis.  The parties' dispute with respect to RWeb is simply a swearing contest with respect to what defendant's representative told plaintiff in 2011 regarding the scope of the parties' licensing agreement.  A jury must decide whether defendant made the representations plaintiff accuses it of having made and whether these representations were false.

ORDER

IT IS ORDERED that

1. Plaintiff Epic Systems Corporation's motion for summary judgment, dkt. #58, is GRANTED in part and DENIED in part.  Defendant Attachmate Corporation may proceed to trial on its claims that plaintiff breached Sections 1, 4.A., 4.B. and 4.C. of the RUO v. 14.0 licensing agreement, the RUO v. 14.1 licensing agreement and the EX 9.3 licensing agreement.  Defendant's claim that plaintiff breached Section 2.C. of the RUO v. 14.0 licensing agreement is dismissed.  Defendant may also proceed on its claim that plaintiff infringed its copyrights related to RUO v. 14.0, RUO v. 14.1 and EX 9.3.

2. Defendant Attachmate Corporation's motion for partial summary judgment, dkt. #55, is DENIED with respect to both plaintiff's good faith and fair dealing claim and

plaintiff's Wisconsin Deceptive Trade Practices Act claim.

     3. Defendant's motion to strike, dkt. #84, is DENIED as moot.

Entered this 21st day of June, 2016.

                    BY THE COURT:
                    /s/
                    BARBARA B. CRABB
                    District Judge