UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

Epic Systems Corporation,

        Plaintiff,

vs.

Attachmate Corporation,

        Defendant.

Case No. 15-CV-179

---

**EPIC SYSTEMS CORPORATION'S MOTION *IN LIMINE* TO EXCLUDE ARGUMENT CONTRARY TO UNDISPUTED EVIDENCE**

**(REDACTED)**

---

This motion *in limine* should be granted to prevent Attachmate from trying to re-write history by arguing at trial that:

- Attachmate would not or could not sell concurrent RUO licenses to Epic before 2014;

- Attachmate would have required Epic to pay a higher price in 2011 than Attachmate actually charged Epic for the same concurrent RUO licenses in March 2014 (i.e. less than $400 per concurrent RUO license); and

- Attachmate would have required Epic to buy more than 400 concurrent RUO licenses in 2011 or would have required Epic to buy tens of thousands of device licenses.

Attachmate makes several contentions, some of which are based on its policies, about whether Attachmate *would have* sold Epic concurrent RUO licenses, how much it *would have* sold those licenses for, and which licenses *would have been* appropriate for the use that Epic put the software to. Attachmate should be prevented from making such arguments, however, because they are completely contradicted by the transaction that

Epic and Attachmate *actually entered into* in March 2014, which answered all of those "would have" questions, and which answers were also confirmed by Attachmate's transactions with other customers. Specifically, there are three revisionist contentions that Attachmate has made in the litigation that are contradicted by the undisputed record evidence, including Attachmate's own documents. First, Attachmate has argued that it had a policy or practice that restricted it from selling Epic concurrent RUO licenses in March 2011. Second, Attachmate has argued that it had a policy of charging a 5:1 price ratio for concurrent licenses, meaning that it sold a concurrent RUO license for 5 times the price of a device RUO license. Third, Attachmate has argued that the consequence of Epic purchasing 400 concurrent RUO licenses in March 2014 instead of March 2011 is that Epic must buy 179,460 device RUO licenses for the full list price of $305 each. Attachmate contends that the delay in buying 400 concurrent RUO licenses, that Epic actually purchased for about $160,000, results in a windfall remedy of $54.7 million (179,460 device licenses x $305= $54.7 million) for exactly the same software used by Epic to perform exactly the same function (*i.e.*, concurrent use of RUO for remote training of no more than 400 users at a time).

Contrary to Attachmate's arguments, the undisputed facts were established by the best and only evidence of what the parties actually would have done – an actual arms-length transaction between Epic and Attachmate in March 2014 – a transaction in which Attachmate was willing to sell 400 concurrent RUO licenses to Epic for less than $400 per license to allow Epic's customers to access text-based training environments on Epic's network (the same use Epic maintained from 2011 to 2014), instead of tens of

thousands of device licenses. Also, the license entered into between the parties is completely void of any language limiting the number of people that could be given permission to use RUO remotely so long as no more than 400 used it at the same time. (*See* Attachmate's Supplemental Answers & Objections to Epic's First Set of Interrogatories, dkt. #83-10, at 5, 23-27 (Supplemental Answer to Interrogatory No. 1 and Exhibit 1).). And there is no language anywhere in the license that states that a breach of the concurrent use provisions requires the licensee to purchase device licenses, as Attachmate is suggesting. Simply put, Attachmate's arguments or evidence is irrelevant to the extent they suggest that (i) Attachmate had restrictions on whether it could sell Epic concurrent RUO licenses in 2011, (ii) the price for concurrent RUO licenses would have been any higher than the price Attachmate actually charged Epic for 400 concurrent RUO licenses in March 2014, which was less than $400 per concurrent RUO license, and (iii) Attachmate would have required Epic to purchase more than 400 concurrent RUO licenses or tens of thousands of device licenses. Therefore, Attachmate should be precluded from making such arguments or adducing such evidence.

Moreover, even assuming there was some minimal relevancy to such evidence, it should all be excluded under Rule 403. Rule 403 authorizes the exclusion of evidence (even relevant evidence) if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, wasting time, and needlessly presenting cumulative evidence. Fed. R. Evid. 403. Here, it would be an utter waste of the Court's time, as fact finder, to permit Attachmate to make these arguments. ▇▇▇▇▇▇


[REDACTED] (*See* dkts. ## 63-8, 90-2, 90-3 (entry at line 285) 90-4 (entry at line 278), 141-1.) It would also be unfairly prejudicial to allow Attachmate to make such unfounded arguments or refer to policies not practiced or applied here, as there is no support in the record that such policies have ever been applied outside of Attachmate's arguments in this litigation. The miniscule probative value of such argument, if any, is substantially outweighed by the risk of undue prejudice, confusion and waste of time. Thus, Attachmate should be precluded from arguing or trying to introduce evidence to suggest that Attachmate would not have sold Epic concurrent RUO licenses or that Epic would have or should have paid any more than $400 for each concurrent RUO license, or that Epic should have bought tens of thousands of RUO device licenses instead of the 400 concurrent RUO licenses Attachmate sold Epic in March 2014.

**I.     Attachmate Should Be Precluded From Arguing At Trial That It Would Not Or Could Not Sell Epic Concurrent RUO Licenses Between 2011 And 2014.**

[REDACTED] (*See* dkts. ## 63-7, 63-18 – 63-20.) There is no admissible evidence to support Attachmate's suggestion that it could or would not have made the very same sale to Epic earlier, and all evidence confirms that Attachmate would and did sell concurrent RUO licenses to other customers in 2011 and to Epic in 2014.

██████████████████████████████████████

██████████████████████████████████████ (*See* dkt. #90-3 (entry at line 285).)

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████ (*See* dkt. #141-1.)

Finally, there were no changed circumstances between 2011 and 2014 as between Epic and Attachmate, or Epic's use of the software.  Thus, in light of this undisputed evidence that Attachmate could sell and did sell concurrent RUO licenses between 2011 and 2014, Attachmate should be precluded from arguing or trying to introduce evidence to suggest that it was unwilling or unable to sell concurrent RUO licenses to Epic in March 2011 just as it did in March 2014.

**II.     Attachmate Should Be Precluded From Arguing At Trial That It Has A Policy Or Practice Of Charging Five Times The Full List Price Of A Device RUO License When It Sold A Concurrent RUO License Which Should Apply To Establish Epic's Price.**

Attachmate contends that it has a policy of charging a 5:1 price ratio for concurrent RUO licenses, meaning that Attachmate sells a concurrent RUO license for five times the full list price of a single device RUO license.  ████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████ (*See* dkts. ##61-1 – 61-3, 63-2 – 63-6, 63-20; *see also* Benz Dep., dkt. #44, at 143:19 – 144:14, 146:18 – 24.) ████████████



████████ (see dkt. #63-2), ████

████████████████████████████████

████ (see dkt. #90-3). ████████████████

████████████████████████████████ (see Declaration of Kenneth M. Albridge III, Ex. 1 (ATTACH-EPIC_00001403), filed herewith), ████████████████████

Moreover, not only is there no admissible evidence in the record that Attachmate followed its 5:1 price ratio with Epic, but there is no evidence it followed the ratio with any other customer. Simply put, the 5:1 price ratio is entirely irrelevant to this case. At best, the 5:1 price ratio would serve to confuse and waste time by permitting Attachmate to argue that it would have charged Epic an exorbitant price even though that price was much more than (1) Attachmate actually ever charged Epic; (2) Attachmate has charged any other customer; and (3) has ever been charged in the actual marketplace. Thus, in light of this undisputed evidence, Attachmate should be precluded from arguing or trying to introduce evidence to suggest that the price for a concurrent RUO license it would have sold Epic between March 2011 and March 2014 would have been any higher than $400 per license which is the only established price between Attachmate and Epic for concurrent RUO licenses.

**III.  Attachmate Should Be Precluded From Arguing That Epic Was Required To Buy More Than 400 Concurrent RUO Licenses Or That Epic Was Required To Buy Tens Of Thousands Of Device Licenses.**

■■■ (*See* dkt. #104 (PFOF #13) *see also* dkt. #61-36; Babai Dep., dkt. #42, at 50:19 – 51:10; Benz Dep., dkt. #44, at 143:19 – 144:14, 146:18 – 24.) ■■■ (*See* dkt. #63-15.)  Based upon the evidence, Epic and Attachmate agreed that Epic was buying these licenses for concurrent use, not for device based use.

In order to maximize its damage claim in this lawsuit[1], Attachmate conveniently ignores the undisputed facts that Attachmate agreed to sell Epic concurrent RWeb licenses in March 2011 and again in September 2011, and also agreed to take those concurrent RWeb licenses back in trade from Epic with an additional payment of about $95,000 for 400 concurrent RUO licenses in March 2014. Attachmate contends that Epic breached the license for Epic's use of RUO because Epic bought the concurrent RWeb licenses in 2011 rather than concurrent RUO licenses which it bought in March 2014. ███████████████████████████████████████████████████████████████ (*See* dkt. #141-2 (see Request to Admit No. 119); *see also* dkts. ## 61-25, 61-35.) In other words, according to Attachmate, the

---

[1] Attachmate seeks a remedy that would require Epic to buy as many as 179,460 device licenses for $54.7 million, plus interest. In light of the fact that Epic used only 400 concurrent RUO licenses for the specific application at issue, if Attachmate could prove a breach (i.e. that Epic used more than 400 concurrent RUO licenses at the same time), the remedy would be to purchase additional concurrent RUO licenses to make up the difference. Attachmate has declined this approach in favor of the argument that Epic's compliance should not be evaluated based on whether Epic had the correct type of concurrent licenses or a sufficient number of concurrent licenses, but instead whether Epic had a sufficient number of device RUO licenses to accommodate use by every single potential user who was given access to RUO even though the contemporaneous documents establish that Attachmate sold Epic RWeb and RUO concurrent licenses for an application that was not suited for device licenses, nor would it have been reasonable for the parties to contemplate that Epic would be evaluated for compliance based on a device RUO license because it has always used terminal emulation software concurrently for this particular application, including SmarTerm (pre-March 2011), RUO (March 2011 through June 2015) and PuTTY (since June 2015).

consequence of Epic's alleged breach – using RUO concurrently while it owned concurrent RWeb licenses before Epic traded-in its RWeb licenses for RUO licenses – is that Epic must buy 179,460 RUO device licenses at Attachmate's most recent full list price of $305. (*See* dkt. #23-11.)

This position is contrary to the undisputed facts, and contrary to the law for breach of contract which permits the party alleging a breach to recover as damages no more than the amount necessary to be put in as good a position as it would have been had the contract been performed. *Rathke v. Roberts*, 33 Wn.2d 858, 865, 207 P.2d 716, 720 (1949) (internal citation omitted). Because Attachmate has alleged a breach arising from the manner in which Epic used RUO software concurrently (not on devices), the best position Attachmate could have expected absent the alleged breach would have been for Epic to have purchased 200 concurrent RUO licenses in March 2011 and 200 additional concurrent RUO licenses in September 2011 instead of the concurrent RWeb licenses Epic bought, which would have avoided the need for the transaction that took place in March 2014 where Attachmate accepted Epic's 400 concurrent RWeb licenses and $95,000 in trade for 400 concurrent RUO licenses. Thus, Attachmate should be limited to arguing that this is the appropriate remedy for Epic's use of RUO concurrently and precluded from arguing that the remedy for breach would require Epic to purchase thousands, tens of thousands or hundreds of thousands of device licenses.

## CONCLUSION

For all the foregoing reasons, Epic respectfully requests that the Court grant Epic's motion *in limine* to preclude Attachmate from arguing at trial that:

A. Attachmate would not or could not sell concurrent RUO licenses to Epic before 2014;

B. Attachmate would have required Epic to pay a higher price in 2011 for concurrent RUO licenses than Attachmate actually charged Epic for the same concurrent RUO licenses in March 2014 (i.e. less than $400 per license); or

C. Attachmate would have required Epic to buy more than 400 concurrent RUO licenses in 2011 or would have required Epic to buy tens of thousands of device RUO licenses instead of 400 concurrent RUO licenses.

Dated this 24th day of June, 2016.

                                  **MICHAEL BEST & FRIEDRICH LLP**

                                  By:  *s/ S. Edward Sarskas*
                                          S. Edward Sarskas, SBN 1025534
                                          Patricia L. Jenness, SBN 1082658
                                          100 East Wisconsin Avenue, Suite 3300
                                          Milwaukee, WI  53202
                                          Phone:  414.271.6560
                                          Fax:  414.277.0656
                                          sesarskas@michaelbest.com
                                          pljenness@michaelbest.com

                                          Ian A. J. Pitz, SBN 1031602
                                          Albert Bianchi, Jr., SBN 1056920
                                          Kenneth M. Albridge III, SBN 1078384
                                          1 S. Pinckney Street, Suite 700
                                          Madison, WI  53703
                                          Phone:  608.257.3501
                                          Fax:  608.283.2275
                                          iapitz@michaelbest.com
                                          abianchi@michaelbest.com
                                          kmalbridge@michaelbest.com

                                *Attorneys for Plaintiff Epic Systems Corporation*