UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

Epic Systems Corporation,

        Plaintiff,

vs.

Attachmate Corporation,

        Defendant.

Case No. 15-CV-179

---

### EPIC SYSTEMS CORPORATION'S MOTION IN LIMINE TO PRECLUDE ATTACHMATE CORPORATION FROM PRESENTING EVIDENCE OR ARGUMENT ON IMPROPER MEASURES OF DAMAGES

### (REDACTED)

---

Throughout this lawsuit Attachmate has asserted it is entitled to between $15 million and $54 million as a result of Epic allegedly breaching a licensing agreement governing Epic's use of Attachmate's Reflection for UNIX and OpenVMS software ("RUO"). Attachmate's pie-in-the-sky damages calculations are based on pure speculation and conjecture. Moreover, Attachmate's calculations fail to apply the proper measure of damages in this lawsuit, and would result in a huge, undeserved windfall. Accordingly, the Court should preclude Attachmate from making arguments or presenting evidence based on erroneous and entirely unsupported measures of damages.

As the Court recognized in its Summary Judgment Order, Attachmate's theory and method for calculating damages is dubious. (Dkt. #144 at 22.) Not only has

Attachmate argued that it is entitled to damages based on the total number of individuals who theoretically *could have* accessed RUO v. 14.0, but it has argued that its damages should be determined based on the full list price of device-based licenses ($305) even though it is undisputed that it sold the same licenses to Epic for $89 in 2011 and $53 per license in 2012. Attachmate's method of calculating damages is improper under the applicable law and the license agreement. The breach Attachmate has alleged is that Epic used RUO concurrently when it had purchased concurrent RWeb licenses instead of concurrent RUO licenses. However, it is beyond dispute that Epic owned concurrent licenses before it began using RUO concurrently, but according to Attachmate they were not the correct concurrent licenses. If Attachmate establishes Epic is liable for breach, Attachmate would be entitled to, at best, the price Epic would have paid in 2011 for 400 concurrent RUO licenses (less the amount Epic paid in 2011 for 400 concurrent RWeb licenses). In other words, in order for Attachmate to be placed in the position it would have enjoyed had Epic not supposedly breached the license agreement provisions concerning concurrent use, Epic merely would have had to purchase 400 concurrent RUO licenses in 2011 at the actual price Attachmate would have sold those licenses at that time.[1] Accordingly, Attachmate should be precluded from arguing or offering evidence contrary to the proper measure of damages based upon Attachmate's revenue-maximizing theory that the proper remedy for Epic's use of

---

[1] As it happens, the parties know what the terms for that transaction would have been (less than $160,000) because that transaction actually occurred in March 2014 for the exact same use of the same RUO software for which Attachmate is now claiming it is owed $54 million plus interest. Epic used RUO concurrently between March 2011 and March 2014, and Attachmate agreed that the value of using RUO as Epic did, concurrently, was no more than what it charged Epic in March 2014 for 400 concurrent RUO licenses - less than $160,000.

concurrent RUO software would require Epic to purchase tens or hundreds of thousands of device licenses at its inflated full list price.

## ARGUMENT

### I. The Proper Measure Of Breach Of Contract Damages Under Washington Law Places The Non-Breaching Party In No Better Position Than It Would Have Enjoyed Absent The Breach.

Under Washington law, to recover on a breach of contract claim the non-breaching party needs to prove a breach, that the non-breaching party suffered actual economic damages as a result of the breach and a supported amount of damages. *Columbia Park Golf Course, Inc. v. City of Kennewick*, 160 Wn. App. 66, 83, 248 P.3d 1067, 1076 (Ct. App. Wash. 2011). "The general measure of damages for breach of contract is that the injured party is entitled (1) to recovery of all damages that accrue naturally from the breach, and (2) to be put into as good a pecuniary position as [it] would have had if the contract had been performed." *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 39, 686 P.2d 465, 470 (Wash. 1984). In other words, "recovery is limited to the loss [the non-breaching party] has actually suffered by reason of the breach; [it] is not entitled to be placed in a better position than [it] would have been in if the contract had not been broken." *Rathke v. Roberts*, 33 Wn.2d 858, 865, 207 P.2d 716, 721 (1949) (citation omitted). Also, "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." *Columbia Park Golf Course, Inc.*, 160 Wn. App. at 83, 248 P.3d at 1076.

Moreover, when a party is seeking lost profits, "damages for lost profits must be for profits actually lost, and these must be proven with reasonable certainty." *Magna*

*Weld Sales Co. v. Magna Alloys & Research Pty.*, 545 F.2d 668, 672 (9th Cir. 1976) (applying Washington law and citing *Nat'l Sch. Studios, Inc. v. Superior Sch. Photo Serv., Inc.*, 40 Wn.2d 263, 242 P.2d 756 (1952)). Also, "[f]ailure to obtain anticipated 'pie in the sky' is not a financial loss, however disappointing it may be." *Id.* In proving lost profits to a reasonable certainty, the non-breaching party must establish proof of the loss with evidence that is "clear and convincing, free from speculation or conjecture." *Carlson v. Leonardo Truck Lines, Inc.*, 13 Wn. App. 795, 801, 538 P.2d 130, 133 (Ct. App. Wash. 1975) (internal quotation omitted). Thus, proving lost profits is often a difficult task. *See Carlson*, 13 Wn. App. at 799 - 803, 538 P.2d at 132 – 134 (citing various cases in which Washington courts found that non-breaching party had failed to establish lost profits with reasonable certainty).

## II.    Attachmate Should Be Precluded From Arguing That Its Measure Of Damages Is The Cost Of 179,000 Device Licenses.

If Attachmate proves that Epic breached the RUO v. 14.0 software license, then Attachmate is entitled to be put into as good a pecuniary position as it would have had if the contract had been performed and nothing more. *Rathke*, 33 Wn.2d at 865-66, 207 P.2d at 721. By the terms of the applicable license agreement, the absolute best pecuniary position Attachmate is entitled to be put into is that Epic would have purchased 400 concurrent licenses to RUO v. 14.0 in 2011 instead of purchasing 400 concurrent licenses to RWeb in 2011. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

▇▇▇▇▇▇▇ (*See* dkt. #104 (PFOF #13) *see also* Babai Dep., dkt. #42, at 50:19 – 51:10; Benz Dep., dkt. #44, at 85:7 – 86:1.) Suggesting that Epic would need to purchase upwards of 179,000 device-based licenses as a remedy for owning concurrent RWeb licenses instead of RUO concurrent licenses before actually acquiring RUO concurrent licenses is a pie-in-the-sky request that has no support in any evidence or law. Attachmate's position is also contrary to the fact that Attachmate agreed that Epic could use Attachmate's terminal emulation software concurrently for remote external training and Attachmate understood that Epic did not need or use RUO on devices, as its breach argument tries to pretend.

The RUO v. 14.0 end user license agreement that Attachmate asserts as applicable here states that the licensee is granted a license to use the software "for internal business purposes in accordance with the terms of this Agreement and the applicable product use rights set forth in the Appendix ("Product Use Rights")." (Attachmate's Supplemental Answers & Objections to Epic's First Set of Interrogatories, dkt. #83-10, at 5, 23-27 (Supplemental Answer to Interrogatory No. 1 and Exhibit 1).). Turning to the Product Use Rights Appendix, for Reflection Software for Windows-Based Emulation, which Epic used, the license provides for *both* a use of the software with desktop licenses and a use of the software with concurrent licenses.[2] (*Id.*) With respect to using the software concurrently the licensee needed, in part, to "acquire concurrent licenses for the maximum number of users who will use or access the

---

[2] Attachmate's RUO software is exactly the same software regardless of whether it is deployed on a concurrent basis through a server or installed on an individual device.

- 5 -

Software at the same time." (*Id.*) The breach that Attachmate has alleged is that in March 2011 Epic acquired concurrent licenses for RWeb and not concurrent licenses for RUO, but Epic was using RUO concurrently. To remedy the breach (*i.e.*, put Attachmate in as good a pecuniary position as it would have been in if the contract had been performed), Epic need only do exactly what the terms of the license for RUO states: "acquire concurrent licenses for the maximum number of users who will use or access the Software at the same time."

Attachmate's arguments that Epic needed to purchase some number of device-based licenses is simply not the measure of damages under the contract terms. Attachmate is trying to impose the terms of the license agreement that apply only to device based users, when it is undisputed that Epic was using RUO on a concurrent basis, not a device basis. Thus, to argue otherwise would give Attachmate a windfall as opposed to putting it in the same pecuniary position as if the contract had not been breached. Under Attachmate's improper measure of damages, its calculation leads to over $54 million for a use of RUO that Attachmate agrees Epic was properly licensed for in 2014 for a little more than $150,000. Indeed, the contrast between Attachmate's improper measure of damages and Epic's purchase of 400 concurrent RUO licenses in 2014 is stark and highlights the unreasonableness of Attachmate's position and audit practices:

1. Attachmate contends that Epic's failure to purchase 400 concurrent RUO licenses in 2011 results in Epic needing to purchase more than **179,000 RUO device licenses** for over **$54 million** because Epic deployed RUO concurrently to allow remote customer access to its text-based training environments;

2. In 2014 Epic traded in its 400 concurrent RWeb licenses, for which it had paid $62,600, and upgraded to 400 concurrent RUO licenses for $91,200, meaning that in total Epic paid **$153,800** for **400 concurrent RUO licenses** to allow Epic to deploy RUO concurrently to allow remote customer access to its text-based training environments.

In other words, it would be prejudicial error to permit Attachmate to argue that an alleged breach that would have been unquestionably avoided if in March 2011 Attachmate had sold Epic 400 concurrent RUO licenses could now result in tens of millions of dollars of damages.[3]

Moreover, in licensing software, it is nonsensical for a party seeking concurrent licenses for concurrent use of software to purchase device licenses. (*See* dkt. #51 at 6-9.) When Epic decided in March 2011 to purchase software licenses from Attachmate, it decided to buy licenses for concurrent use because of the particular way it intended to use the software, and Epic intentionally decided not to buy device licenses for this use. Epic replaced concurrent SmarTerm with concurrent RUO which it used under the RWeb licenses and then the RUO licenses it purchased from Attachmate. Epic's use of RUO concurrently had absolutely nothing to do with device based use of RUO. The absurdity of Attachmate's position is also borne out by the fact that Epic had alternatives to Attachmate's software if Attachmate had refused to sell its terminal emulation software at a market competitive price. (*See* dkt. #61, ¶ 35.) Epic's alternatives included using the concurrent SmarTerm software it already owned that it had purchased for approximately $14,000, or switching to a free software product for

---

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* dkt. #63-8; Declaration of Kenneth M. Albridge III ("Albridge Decl."), Exs. 2-4, filed herewith.

the same purpose.[4]  *Id.*  There is no reason that Epic would have paid tens of millions of dollars for device based software when it is undisputed that concurrent based alternatives were available at a reasonable price, or for free.  Thus, to argue that any number of device licenses, let alone 179,000 plus, is simply an effort to apply the wrong measure of damages here.

Additionally, even if one were to ignore the terms of the license agreement, for Attachmate to argue that the remedy for an alleged breach arising from the way Epic used RUO concurrently is for Epic to purchase over 179,000 device licenses assumes that there is at least some evidence that around 179,000 unlicensed devices used RUO v. 14.0.  However, no such evidence exists.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  (*See* Baker Dep., dkt. #43, 23:1 – 4; dkt. #63-22.)

Furthermore, assuming Attachmate is requesting approximately 179,000 device licenses as lost profits, it has no clear and convincing evidence, free from speculation or conjecture that Epic's breach actually lost Attachmate 179,000 device licenses.  In fact, Attachmate has no evidence, other than attorney argument, that it could have sold 179,000 device licenses to Epic.  Epic did not want or need device licenses for this

---

[4] Since this lawsuit began, Epic has in fact switched to this free terminal emulator alternative. Dkt. #61 (Benz Decl.) ¶ 35.

particular purpose. The evidence produced shows that Attachmate has never even sold 25,000 device licenses to a single customer. (*See* dkt. #141-2 (Request to Admit Nos. 119 – 125).) And there is no evidence that Attachmate has sold even a single device license at its full list price of $305. ████████████████████████████████████████████████████████████████████████████████████████████ (*see* Albridge Decl., Ex. 1 (ATTACH-EPIC_00001403)), and the record contains no evidence that Attachmate ever sold RUO at a price anywhere near its $305 list price.

Any reference to Epic having to have purchased over 179,000 device licenses at full list price to remedy the alleged breach of the RUO v. 14.0 license agreement for Epic's concurrent use would point to the wrong measure of damages under Washington law. Also, it would be a waste of time, confusing and unfairly prejudicial in violation of Federal Rule of Evidence 403 to let Attachmate argue that it was damaged in an amount equal to the price list cost of over 179,000 device licenses when the argument is based on pure speculation and, frankly, Attachmate's pure greed run rampant in violation of its duty of good faith and fair dealing. Thus, the Court should preclude Attachmate from arguing for any measure of damages other than the proper one: the difference between the price Epic paid for 400 concurrent RWeb licenses in 2011 and the price Epic would have paid for 400 concurrent RUO licenses in 2011, which is informed by the actual amount that Attachmate charged Epic for 400 concurrent RUO licenses in March 2014.

### III. Attachmate Should Be Precluded From Arguing That Its Damages Could Be Measured By Estimates Of The Number Of "Unique External Trainees."

Recognizing that its unsupported request for damages equal to over 179,000 device licenses was doubtful, Attachmate changed course in the 11th hour and suggested that it should receive damages in an amount equal to device licenses to cover an approximated number of "unique External Trainees." (*See* dkt. #127-5.) However, as already stated, there is no scenario in which device-based licenses should serve as the measure of damages arising from an alleged breach in the manner Epic used RUO concurrently. But that aside, the basis for Attachmate's number of "unique" trainees is flawed and speculative. Attachmate's guessed range of the low and high numbers is not the type of clear and convincing evidence free from speculation or conjecture that can support a lost profit damage calculation.

Attachmate's reference to "unique External Trainees" suggests that each month's "unique user" would have been a user that had never accessed the software in a prior month or a later month, and that each user was accessing the software from a different device such that each "unique user" should have his/her own license. However, Mr. Shivers' testimony does not support those assumptions. (*See* Shivers 30(b)(6) Dep., dkt. #133, at 56:18 – 60:24.) In fact, the reality is that such a small number of users with permission to access the text-based training environment on Epic's servers actually do access such environments, making it more than reasonable that the same users would be accessing the text-based training environment month to month and that access would be from the same device or devices. All of which means that the numbers on

which Attachmate bases its calculation, which were expressly stated as speculation anyway as discussed below, do not support Attachmate's calculations.

When Mr. Shivers was asked about his best estimate as to the number of customers who would have been connecting to a text-based environment on Epic's internal network, he provided estimates based on his "speculation." (*See* Shivers' 30(b)(6) Dep., dkt. #133, at 56:18 – 57:17.) Mr. Shivers was expressly stating that he was guessing. And Attachmate specifically bases its supplemental damages numbers on Mr. Shivers' speculation.[5] (*See* dkt. #127-5.) However, lost profit damages, like those sought by Attachmate, need to be proven with reasonable certainty and such speculative testimony cannot satisfy that standard. *See Carlson*, 13 Wn. App. at 799 - 803, 538 P.2d at 132 – 134. Accordingly, Attachmate should be precluded from arguing

---

[5] Ironically, Attachmate argues that Epic's damage expert has not complied with the requirements of Rule 702 or *Daubert*. However, it is Attachmate's damage computations that are subject to exclusion for numerous errors in fact and law. Perhaps the most egregious is Attachmate's mischaracterization of the promise that it alleges Epic breached for which it seeks damages. *See* dkt. ##143-1 at 2. Attachmate contends that it is entitled to damages for breach of Epic's promise to acquire and dedicate a desktop license for each single computer on which the Software is "used." *Id.* However, Attachmate's position is inconsistent with the language of the contract and the record. The license agreement has two provisions—one that governs device-based usage (i.e., the desktop license) and one that governs concurrent-based usage (i.e., the concurrent license). They are mutually exclusive. And to the extent there has been any breach here at all (there has not), any breach would have to have been to the concurrent license provision pursuant to which Epic promised to "acquire concurrent licenses for the maximum number of users who will use or access the software at the same time." Indeed, in March 2014, Attachmate sold Epic RUO concurrent licenses to cover the usage that Attachmate now claims breached the license agreement beginning in March 2011 when Epic bought RWeb concurrent licenses it believed applied to its use of RUO concurrently. Epic's use of RUO was concurrent not device-based, and thus whether it complied with the terms of the license agreement would be evaluated against the terms that apply to concurrent use, and not terms that would apply to device-based use, as Attachmate urges in order to inflate its damage claim. Obviously, a licensee who intends to and does use RUO concurrently, as Epic did, does not promise to comply with the provision for device-based use and vice versa. Epic promised to use RUO concurrently according to the provisions governing concurrent use not according to the provisions governing device-based use.

for any measure of damages based on speculative range of numbers regarding "unique External Trainees."

**IV.    Attachmate Should Be Precluded From Arguing For A Measure Of Damages Based On A List Price Of Any Type Of License.**

Attachmate's damages calculations are based on the list price for both device and concurrent licenses to RUO v. 14.0. (*See* dkts. ## 22-11, 126-5; *see also* dkts. ## 90-3, 90-4.) However, such prices cannot serve as the measure of damages here because there is no evidence that Attachmate ever made any sales to any customers at its listed prices. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (*See* dkts. ## 61-2, 61-25, 61-35, 63-2.) And again, to provide Attachmate with damages based on its full list prices, as opposed to prices actually charged to Epic, would improperly place Attachmate in a better position than it would have been in if the contract had not been broken. *See Rathke*, 33 Wn.2d at 865-66, 207 P.2d at 721.

Attachmate's list price for its RUO licenses is like a price tag at many stores promoting discounts, where no one pays the actual price on the tag as there is always a sale providing either some large percentage off the tag price or buy-one-get-one deal that significantly lowers the price of each item. In the end, the customer is led to believe he or she received a deal, when in reality the seller never sells the product for its inflated list price. ████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (*see* Albridge Decl., Ex. 1 (ATTACH-EPIC_00001403)).  Attachmate's request should be rejected.

Attachmate now wants to use its inflated list prices for RUO licenses to measure its damages as opposed to the actual prices Attachmate used to sell Epic both device-based and concurrent RUO licenses.  This it cannot do.  To put Attachmate into as good a pecuniary position as it would have been if Epic had completely performed the contract, the actual prices Attachmate charged Epic for device-based and concurrent RUO licenses are the only prices that can be used.  Accordingly, Attachmate should be precluded from offering as a measure of damages any calculation based on any price for device-based or concurrent licenses higher than what Epic was actually charged.

## V. The Preclusions Apply To Attachmate's Request For Copyright Damages As Well.

The proper measure of Attachmate's damages under Washington contract law mirrors the measure of damages under copyright law.  *See Neri v. Monroe*, No. 11-cv-429-slc, 2014 U.S. Dist. LEXIS 24176, at *35 (W.D. Wis. Feb. 25, 2014) (noting that under the Copyright Act actual damages and lost profits both require that the copyright owner show it suffered a loss or that the infringer gained a benefit and that fact must be shown with more than speculation); *see also Chi-Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1229 (7th Cir. 1991) (noting that actual damages and lost profits attributable to an infringement are often "virtually impossible to prove").  Any loss Attachmate could have suffered from any alleged infringement would, at best, stem from the lost sale of concurrent RUO licenses in 2011 or lost sales of additional concurrent RUO licenses in

2014. Those alleged losses must be limited to concurrent licenses, not tens of thousands of device-based licenses, and to the actual cost of those licenses as sold to Epic. Accordingly, Attachmate should be precluded from arguing that its copyright damages are any different than its contractual damages.

## CONCLUSION

For all the reasons set forth above, Attachmate should be precluded from presenting arguments or evidence regarding any measure of damages other than the difference in price between 400 concurrent RWeb licenses in 2011 and 400 concurrent RUO licenses in 2011.

Dated this 24th day of June, 2016.

        **MICHAEL BEST & FRIEDRICH LLP**

By:  *s/ S. Edward Sarskas*
    S. Edward Sarskas, SBN 1025534
    Patricia L. Jenness, SBN 1082658
    100 East Wisconsin Avenue, Suite 3300
    Milwaukee, WI 53202
    Phone: 414.271.6560
    Fax: 414.277.0656
    sesarskas@michaelbest.com
    pljenness@michaelbest.com

    Ian A. J. Pitz, SBN 1031602
    Albert Bianchi, Jr., SBN 1056920
    Kenneth M. Albridge III, SBN 1078384
    1 S. Pinckney Street, Suite 700
    Madison, WI 53703
    Phone: 608.257.3501
    Fax: 608.283.2275
    iapitz@michaelbest.com
    abianchi@michaelbest.com
    kmalbridge@michaelbest.com

*Attorneys for Plaintiff Epic Systems Corporation*