Epic Systems Corporation,

       Plaintiff,

  vs.                              Case No.  15-cv-179-bbc

Attachmate Corporation,

         Defendant.

## EPIC SYSTEMS CORPORATION'S STATEMENT OF FACTS

Plaintiff Epic Systems Corporation ("Epic") submits the following statements of fact pursuant to the Court's Order in Non-Jury Cases Assigned to Judge Crabb:

## THE PARTIES

1.      Epic is a Wisconsin corporation existing under the laws of the State of Wisconsin with its principal place of business located at 1979 Milky Way, Verona, Wisconsin 53593.  [STIPULATED]

2.      Founded in 1979, Epic is a private company that makes software for mid-size and large medical groups, hospitals and integrated healthcare organizations. [STIPULATED]

3.      Epic develops and supports all its software applications in-house and has more than 7,000 employees based in Verona, Wisconsin.  [STIPULATED]

4.      Epic has maintained its headquarters in Verona, Wisconsin since 2007. [STIPULATED]

5.      Defendant Attachmate Corporation ("Attachmate") is a Washington corporation with its principal place of business at 705 5th Avenue South, Suite 100, Seattle, Washington 98104. [STIPULATED]

6.      Attachmate develops, owns and licenses various types of software, including a Reflection line of "terminal emulation software" products. [STIPULATED]

7.      "Terminal emulation software" enables users of one type of computer operating system to access information maintained on a different type of computer operating system.

8.      Attachmate owns copyright registrations pertaining to certain terminal emulation software, including Reflection for UNIX and Open-VMS v. 14.0 ("RUO 14.0"), Reflection for UNIX and Open-VMS v. 14.1 ("RUO 14.1"), and EXTRA X-Treme v. 9.3 ("EX 9.3"), and Epic does not contest the validity of those copyright registrations. [STIPULATED]

9.      The terms of the software license agreements for RUO 14.0, RUO 14.1 and EX 9.3 must be accepted by customers before the software can be installed on the customer's computing devices.  [STIPULATED]

10.     A customer that accepts the terms of the software license may deploy RUO 14.0, RUO 14.1 or EX 9.3 in two principal ways:  (1) it can install the software directly on a user's device, or (2) it can install the software on a network server which is accessible by many different devices.  [STIPULATED]

11.     Deployment through a network server – such as a Citrix server – can allow devices to access software from different locations, including remote locations, without having the software physically installed on the device.  [STIPULATED]

**JURISDICTION**

12.     Epic has filed claims seeking declaratory judgment that it has not infringed Attachmate's copyrights, and Attachmate has filed counterclaims for copyright infringement.  [STIPULATED]

13.     Epic has further filed claims seeking declaratory judgment that it has not breached its license agreements with Attachmate, and Attachmate has filed counterclaims for breach of contract.  [STIPULATED]

14.     Epic has also filed claims for breach of the implied covenant of good faith and fair dealing and violation of Wis. Stat. § 100.18 and raised defenses pertaining to mitigation of damages. [STIPULATED]

15.     An actual case or controversy exists between the parties regarding their rights and legal relations under the Copyright Act, 17 U.S.C. § 101 *et seq.* [STIPULATED]

16.     The parties' software licensing disputes are so related to the parties' copyright claims that they form part of the same case or controversy.  [STIPULATED]

17.     The parties are also diverse, as Epic is a citizen of Wisconsin and Attachmate is a citizen of Washington, and the amount in controversy exceeds $75,000, excluding interest and costs.  [STIPULATED]

## EPIC'S IMPLEMENTATION OF ITS ELECTRONIC HEALTH RECORDS SOFTWARE FOR ITS CUSTOMERS

18.     Upon Epic's customers' purchase of a license to Epic's electronic health records software, Epic begins an implementation process with those customers to install the software and prepare the customers to operate the software at the customer's site.

19.     This implementation process can take between 6 months and 2 years depending on the size of the organization, and which software the applicable customer implements.

20.     Part of the implementation process includes training Epic's health care organization customer's staff on how to use the software.

21.     Customers' clinical staff, like doctors and nurses, are trained to use the software in providing care to patients, and IT staff are trained so that such staff can provide technical support to clinical staff in their use of the software.

22.     The customers' clinical staff, which are often the vast majority of health care organizations' staff, is typically trained on the end user portion of the software, which has a graphical user interface.

23.     The customers' IT staff will receive training in the graphical user interface and also the text-based interface of the Epic software, which is the interface that permits much more significant configuration than at the end-user level to permit changes to the appearance and functions within the graphical user interface.

24.     Because the text-based interface is an older computer program called Unix that cannot be controlled and manipulated in Microsoft's Windows operating system, the IT staff requires a terminal emulator software that allows Windows to communicate with Unix in order to interact with this "text side of Epic".

25.     As part of the implementation process with customers, Epic tells its customers that they need to obtain their own licenses to a terminal emulation software to be able to access the text-side of Epic.

26.     Most of Epic's employees need access to the text side of Epic to provide services to customers or for other internal purposes, and therefore most of Epic's employees need a terminal emulator.

27.     Until 2015, Epic installed a version of Attachmate's Reflection software on every employees' primary computer and most of the shared devices at Epic.

## EPIC'S TRAINING OF CUSTOMERS' EMPLOYEES

28.     As part of Epic's software implementation process, Epic provides on-site training to customers' employees with a training center on Epic's campus that contains over 2,000 training computers.

29.     After customers' employees complete on-site training at Epic, many are assigned additional training to complete remotely upon their return to their health care organizations.

30.     Initially, this remote customer training was accomplished by Epic sending a physical server which was pre-loaded with practice and training environments, which customers would use to complete their training at their own facilities.

31.     The physical servers with practice and training environments Epic provided to customers was referred to as a System With Training Data, called SWTD for short (pronounced SWITTed).

32.     In 2007, Epic begin researching a simpler method to provide remote training and determined that internet based training with the practice and training environments hosted on servers owned and controlled by Epic was the best method, so Epic created the iSWTD.

33.     iSWTD refers to Internet System with Training Data, which is an environment of Epic software hosted at Epic and on Epic's servers that can be accessed by its customers on each customer's respective local computers using Citrix so that customers can continue training on use of Epic's software after leaving Epic's training center.  [STIPULATED]

34.     In 2007, Epic explored what types of software licenses would be required to permit its customers' employees to train remotely over the internet on Epic's extranet where the iSWTD was hosted, including terminal emulation software licenses, and Epic approached Attachmate about licensing Reflection for that purpose.

35.     Epic was only interested in concurrent terminal emulation licenses for its extranet because, although Epic knew it would be training thousands of people, it also knew that relatively few would actually access the text-based training environments and even fewer would be accessing the text-based training environments at the same time.

36.     Epic decided to purchase concurrent licenses to SmarTerm made by a company called Esker, which was Esker's terminal emulation software, to cover its customer's remote access text-based training environments.

37.     Until March 2011, Epic used SmarTerm as the terminal emulation software its customers' employees would access to remotely train in Epic's text-based environments on Epic's extranet.

38.     Epic began considering switching from SmarTerm in early 2011 because the then-updated version of SmarTerm did not work as Epic needed it to for concurrent use on the iSWTD.

**THE PARTIES' COURSE OF DEALING**

39.     More than ten years ago, Epic began purchasing licenses for Attachmate's RUO software.  [STIPULATED]

40.     Trial Exhibit No. 518 is a true and correct copy of the software license agreement entered into between Attachmate and Epic, to which Epic agreed to be bound regarding Epic's deployment of RUO 14.0. [STIPULATED]

41.     Trial Exhibit No. 558 is a true and correct copy of the software license agreement entered into between Attachmate and Epic, to which Epic agreed to be bound regarding Epic's deployment of RUO 14.1.  [STIPULATED]

42.     Trial Exhibit No. 578 is a true and correct copy of the software license agreement entered into between Attachmate and Epic, to which Epic agreed to be bound regarding Epic's deployment of EX 9.3.  [STIPULATED]

43.     Prior to March 2011, Epic purchased 5,330 device-based licenses for use of RUO 14.0 software.  [STIPULATED]

44.     On March 29, 2011, Epic purchased 2,300 device-based licenses for Reflection for UNIX and Open VMS 2011 v. R1 software.  [STIPULATED]

45.     Epic's March 29, 2011 purchase of 2,300 device-based licenses for use of Reflection for UNIX and Open VMS 2011 v. R1 software was at a cost of $89 per license for a total cost of $204,700, not including tax and CDW mark-up.

46.     In March 2012, Epic purchased 2,000 device-based licenses for Reflection for UNIX and Open VMS 2011 v. R2 software.  [STIPULATED]

47.     Epic's March 2012 purchase of 2,000 device-based licenses for use of Reflection for UNIX and Open VMX 2011 v. R2 software was at a cost of $53.04 per license for a total cost of $106,080, not including tax and CDW mark-up.

48.     In March 2014, Epic purchased 1,300 device-based licenses for Reflection for UNIX and Open VMS 2014 v. R1 software.  [STIPULATED]

49.     Epic's March 2014 purchase of 1,300 individual device-based licenses for use of Reflection for UNIX and Open VMS 2014 v. R1 software was at a cost of $125 per license for a total cost of $162,500, not including tax and SHI mark-up.

50.     Under each purchase of device-based licenses for use of Reflection for UNIX and Open VMS software Epic received downgrade rights that allowed it to deploy earlier versions of Reflection for UNIX and Open VMS and specifically beginning in March 2011, every purchase of device-based licenses contained downgrade rights to allow the use of prior versions of Reflection for UNIX and Open VMS, including v. 5.21, v. 9.0, RUO 14.0, and RUO 14.1.  [STIPULATED]

51.     As of March 31, 2014 and to this day, Epic owned, in total, 10,930 device-based perpetual licenses for use of Reflection for UNIX and Open VMS software. [STIPULATED]

52.     Epic used its 10,930 device-based perpetual licenses for use of Reflection for UNIX and Open VMS software on employee workstations and workstations in Epic's training center.

53.     According to the Attachmate Software License Agreement governing RUO 14.0, each device-based software license, also referred to as a desktop license, that Epic purchased permitted Epic to "use" RUO 14.0 software on a single computer in addition to a home or portable computer by the primary user of the computer governed by the device-based license.  [STIPULATED]

54.     Each device-based software license that Epic purchased for RUO provided that the software installed pursuant to the desktop license was "used" "if the software or any component of the software was installed or loaded in the temporary or permanent memory of a computer or otherwise accessed."  [STIPULATED]

55.     Between March 31, 2014 and May 2015, Epic owned a peak total of 10,705 devices, excluding servers, between employee workstations, workstations in Epic's training center and "thin clients" that "used" either RUO 14.0 or RUO 14.1. [STIPULATED]

56.     Up until March 31, 2011, Epic had been using terminal emulation software under concurrent licenses from another company, Esker SmarTerm, so that employees of Epic's customers could access text-based environments on Epic's internal network for training.  [STIPULATED]

57.     On February 23, 2011, Attachmate representatives Bob Babai and Patrick O'Rourke met with Epic representatives, Brian Benz and Josh Kammerud, at Epic's campus in Verona, Wisconsin to discuss Epic's use of Attachmate's software, and during the meeting Epic explained that it was looking for concurrent licenses for terminal emulation software that Epic could use for remote training of customers on the extranet.

58.     At the February meeting, Mr. Benz and Mr. Kammerud described Epic's extranet training environment and asked whether Attachmate had a concurrently licensed terminal emulation software that could work in the described environment.

59.     At the February meeting, Mr. Benz and Mr. Kammerud explained that while there are thousands of people who can remotely access Epic's internal text-based training environments, relatively few of those people, at that time less than 200, would be accessing the environments at the same time.

60.     At the February meeting, Mr. Babai and Mr. O'Rourke suggested that its Reflection for the Web ("RWeb") software could meet Epic's needs for customers to access Epic's text-based training environment on extranet.

61.     Attachmate represented to Epic that they could replace the SmarTerm concurrent software licenses Epic owned with concurrent licenses for RWeb and that RWeb could be used for the same purpose as SmarTerm.

62.     RWeb software licenses are less expensive than RUO licenses and RWeb has approximately 60 to 70% of the features and functionality of RUO software. [STIPULATED]

63.     RUO is merely an enhanced version of RWeb but both perform the same overall function of terminal emulation software.

64.     Epic inquired with Attachmate about concurrent RUO licenses but was told by Attachmate's sales representative assigned to Epic's account, Bob Babai, that Attachmate did not license RUO software on a concurrent basis.

65.     Epic tested and evaluated Attachmate's RWeb software and determined that it would not work well for remote customer training in Epic's text-based environment.

66.     Also, internally, Epic confirmed that the peak number of users accessing text-based training environments, and thus accessing Epic's current terminal emulation software SmarTerm, at the same time was between 90 and 100 users at any given time.

67.     In March 2011 and March 2014, Attachmate's internal policy expressly allowed Attachmate salespersons to sell concurrent licenses to all its software on an exception basis, including RUO, and did not prohibit the sale of concurrent licenses.

68.     Attachmate's internal policy regarding the permissibility of the sale of concurrent RUO licenses did not change between March 2011 and March 2014.

69.     Attachmate's product price list included concurrent licenses for RUO in 2011 in the same manner as in 2014.

70.     Attachmate could have sold Epic concurrent RUO licenses in March 2011 but was concerned Epic might want to switch to concurrent RUO licenses for Epic's employees' use instead of continuing to purchase device-based RUO licenses.

71.     Epic was one of Mr. Babai's top customers and Attachmate wanted Epic to standardize with Attachmate terminal emulation software and thereby displace Epic's use of any competitor's terminal emulation software, such as Esker's SmarTerm.

72.     Attachmate therefore agreed to permit Epic to use RUO software concurrently for Epic's remote customer training applications by paying for concurrent RWeb licenses so that Epic could replace Esker's SmarTerm product with Attachmate's RUO product.

73.     In reliance on Attachmate's agreement to permit concurrent use of the RUO software by paying for concurrent RWeb licenses, Epic agreed to buy and paid for 200 concurrent RWeb licenses in March 2011 for $34,000.

74.     On March 29, 2011, Epic purchased 200 concurrent RWeb licenses. [STIPULATED]

75.     In March 2011, Attachmate charged Epic $154 per concurrent RWeb license for a total price, not including CDW's mark-up and tax, of $30,800.

76.     In March 2011, Epic paid for 200 concurrent licenses for Attachmate's RWeb software so that Epic's customers (i.e., hospitals and healthcare providers) could access text-based environments on Epic's internal network using Reflection for UNIX and Open VMS Windows v. 14.0 to engage in remote training.

77.     Attachmate knew and understood the purpose for which Epic purchased the 200 concurrent RWeb licenses.

78.     Attachmate was aware as early as February or March 2011 that Epic had been using SmarTerm terminal emulation software concurrently, and that other solutions, such as PuTTY were being considered by Epic.  [STIPULATED]

79.     In late March 2011, Epic removed Esker's SmarTerm terminal emulation software and installed RUO 14.0 to those servers that could be accessed by its customers for remote customer training.  [STIPULATED]

80.     According to the Attachmate Software License Agreement governing Reflection for UNIX and Open VMS v. 14.0, there is an express distinction between the number of licenses needed depending upon how RUO is used.

81.     According to the Attachmate Software License Agreement governing Reflection for UNIX and Open VMS v. 14.0, if RUO is installed on desktops a license is needed for each computer that "uses" the software, whereas, if RUO is installed for concurrent use a sufficient number of concurrent licenses must be purchased for the maximum number of users who will use or access the software at the same time.

82.     When it installed RUO 14.0 on internal servers, Epic placed controls and protections on the RUO software such that any customer who accessed RUO on Epic's internal servers could only use RUO to engage in text-based training on the use of Epic's software.

83.     Once RUO was installed on Epic's extranet servers in March 2011 and made available for its customers' use for remote training via Citrix, Epic monitored the number of remote users accessing RUO at the same time.

84.     Epic staff monitored the number of remote users accessing RUO at the same time using the exact same methods and procedures Epic staff had used to monitor the number of remote users accessing SmarTerm at the same time.

85.     Epic's procedure for monitoring the number of remote users accessing RUO at the same time was to use a dashboard monitoring tool provided by Citrix and, based on the total number of users accessing Epic's internal servers for training remotely via Citrix, separate out the users accessing a text-based training environment and count the specific number of those users to determine the maximum number of users at a given time.

86. For each Epic customer whose employees were granted permission to access Epic's text-based training environment, only small fraction of those employees actually accessed Epic's text-based training environment and, consequently, only that small number could use RUO 14.0.

87. A customers' employees who would access Epic's text-based training environment, and thereby use RUO 14.0 for training purposes, would be limited to those employees who would actually access the text-side of the customer's Epic installation.

88. To actually make changes to the interface with Epic's software (as opposed to just training to learn how to make changes) a customer would need to purchase its own terminal emulation software because it could not use the software located on Epic's internal servers for anything but training.

89. Epic encouraged its customers to purchase their own licenses to Attachmate's terminal emulation software so that Epic's customers could access the text-based environments of their own Epic installations,

90. A majority of Epic's customers had their own licenses for their use of Attachmate's software.

91. In September 2011, Epic purchased 200 more concurrent RWeb licenses. [STIPULATED]

92. Epic purchased these additional 200 concurrent licenses for $36,000 after its staff responsible for monitoring and controlling concurrent usage observed that

concurrent usage of RUO 14.0 had increased, and at one point there had been more than 200 users accessing RUO.

93.     In September 2011, Attachmate charged Epic $159 per concurrent RWeb license for a total price, not including CDW's mark-up and tax, of $31,800

94.     Epic thus had purchased and paid for a total of 400 concurrent RWeb licenses in 2011 for approximately $70,000.  [STIPULATED]

95.     Epic never deployed copies of RWeb on its extranet.  [STIPULATED]

96.     A few years later, in March 2014, Mr. Babai informed Epic that he was leaving Attachmate.

97.     Mr. Babai had been Epic's sales representative for Attachmate for more than five years when he was let go in March 2014 due to a reduction in force. [STIPULATED]

98.     After learning Mr. Babai was leaving Attachmate, Epic sought to confirm the number of licenses it had purchased as well as the agreement that the RUO software could be used concurrently based on the number of concurrent RWeb licenses that Epic had purchased in 2011.

99.     Mr. Benz discussed with Mr. Babai that Epic had been using RUO software concurrently on Epic's extranet under the RWeb licenses since March 2011.

100.     Mr. Babai told Epic that he did not remember their 2011 agreement and that Epic would need to purchase concurrent RUO licenses for that use, which he said Attachmate would sell Epic.

101.    Internally, Epic determined that it 400 concurrent RUO licenses will still be sufficient because they rarely even hit, at any given time, 250 users accessing text based environments, which required access to RUO 14.0, at the same time on Epic's extranet servers for remote training.

102.    On March 19, 2014, Attachmate and Epic agreed that Epic would trade in the 400 concurrent RWeb licenses that Epic had purchased in 2011 and pay an additional $95,000 in return for 400 RUO 14.0 concurrent licenses.  [STIPULATED]

103.    Thus, in March 2014, based on Attachmate's statements, Epic was credited with the purchase price of its 400 concurrent RWeb licenses and then purchased 400 concurrent RUO 14.0 licenses for that credit plus an additional $95,000.

104.    In March 2014, Attachmate charged Epic $228 per concurrent RUO 14.0 license for a total price, not including SHI's mark-up and tax, of $91,200.

105.    The 400 concurrent RUO 14.0 licenses that Epic purchased in March 2014 were perpetual.  [STIPULATED]

106.    The difference in price between 400 concurrent RWeb licenses and 400 concurrent RUO licenses at the time of purchase in March 2011 was actually around $50,000.

107.    Attachmate would have sold Epic 400 concurrent RUO licenses in March 2011 for use in Epic's customer training program.

108.    Mr. Babai did not complete any Sales Policy Exception Approval Request or SPEAR for Epic's exchange of concurrent RWeb licenses and payment of an additional $95,000 for concurrent RUO licenses in March 2014.

## THE AUDIT

109.    In March 2014, Attachmate offered to sell Epic upgrades for earlier purchases of device-based RUO licenses for approximately $500,000, and Epic declined to purchase the upgrades.

110.    In November 2014, Epic received an audit request from Attachmate. [STIPULATED]

111.    49.    An on-site audit of Epic's computing environment and software deployments was subsequently conducted in December 2014 by Deloitte LLP who had been hired by Attachmate to conduct the audit.  [STIPULATED]

112.    The automated software discovery script that Deloitte attempted to use to verify whether Attachmate software was published on servers that could be accessed remotely via Citrix initially returned a result of zero.  [STIPULATED]

113.    Epic assisted with the information gathering during the audit and created a script to return an Active Directory list of user names that had been given permission to access Epic's extranet Citrix servers on which Epic installed the RUO 14.0 software, which consisted of approximately 180,000 user names.  [STIPULATED]

114.    The Active Directory list of user names that had been given permission to access, via Citrix, Epic's internal extranet servers on which the RUO 14.0 software was installed consisted of customer trainees and Epic employees.

115.    The computer script created by Epic for Attachmate's audit did not identify users or devices that had actually "used" or "accessed" RUO 14.0 on Epic's servers.  [STIPULATED]

116. On or about February 17, 2015, Attachmate communicated with Epic its conclusion from the audit that there was a compliance issue regarding the deployment of RUO 14.0, RUO 14.1 and EX 9.3 software. [STIPULATED]

117. Epic produced records reflecting the number of deployments of RUO on Epic owned devices, including employee computers and shared computers used for training, covering the course of time Epic deployed RUO.

118. Attachmate's audit did not reveal that Epic used RUO concurrently from March 2011 through March 2014 after purchasing concurrent RWeb licenses.

119. At no point during the audit, did the auditors or Attachmate ask Epic when RUO 14.0 had been deployed on Epic's extranet.

120. Attachmate's audit did not address Epic's use of any Attachmate software from 2011 through 2014.

## ATTACHMATE'S POSITIONS AFTER COMPLETION OF DELOITTE AUDIT

121. Following the audit, on a February 2015 phone call with Epic, Attachmate took the position that Epic had not been using RUO for Epic's "internal business purposes" and therefore, Epic owned Attachmate more than $100 million.

122. Attachmate also took the position that Epic was not entitled to any credit for its concurrent RUO licenses such that they would be applied against any deployments or use of RUO by Epic.

123. Attachmate further took the position that Epic had not monitored and controlled concurrent use of the RUO software.

124.    In March 2015, maintained that Epic had over deployed RUO 14.0 by giving Epic's customers access to the software and that the over deployment would cost Epic over $100 million.

125.    Epic responded by asking for an explanation of what licenses Attachmate believed Epic should have had to avoid having breached but Attachmate never responded to that inquiry and instead simply maintained that Epic had breached the "internal business purpose" provision of the license agreement.

126.    Epic then provided Attachmate with emails between Epic and Mr. Bob Babai to demonstrate that Attachmate had been aware of how Epic intended to use RUO 14.0 so that Epic customers could access the software remotely to train on Epic's extranet.

127.    Epic additionally pointed Attachmate to a customer story, for PDMI, on Attachmate's own website that promoted the same use of Attachmate's customers as Epic has been using the software, i.e., so Epic's customer could access the software for training on Epic's extranet, which Epic maintained and controlled.

128.    Attachmate maintained its position that Epic had not been using RUO 14.0 for an internal business purpose and thereby it had breached the license agreement.

129.    Epic provided additional information, in June 2015, explaining in detail how it had monitored and controlled concurrent use of Attachmate's software and how Epic's installation of RUO 14.0 on its servers for deployment to the extranet had been done in a manner such that customers could only use RUO 14.0 to engage in training on Epic's software environments.

130.     Attachmate did not ask Epic about the date that RUO 14.0 was deployed on Epic's extranet until June 22, 2015.

131.     Then, in this litigation, Attachmate took the position that Epic was required to purchase device licenses for all users who had permission to access RUO 14.0 on Epic's internal servers, which would cost Epic upwards of $54 million, plus interest, calculated using Attachmate's full list price of $305 per device-based RUO license.

132.     In January 2016, Attachmate dropped its position that Epic had not used RUO 14.0 for an "internal business purpose" when it permitted its customers to remotely access servers where RUO 14.0 was deployed.

## THE RUO 14.0 LICENSE AGREEMENT

133.     Epic did not materially breach the RUO 14.0 license agreement.

134.     Trial Exhibit 518 was drafted by Attachmate and contains the license terms for several different Attachmate software products, including RUO and RWeb.  It also contains license terms for different types of licenses, including the RUO 14.0 Desktop License and the RUO 14.0 Concurrent License.  [STIPULATED]

135.     Washington law applies to interpretation of the RUO 14.0 license agreement: "This Agreement is governed by the laws of the State of Washington, USA, excluding its conflict of laws rules, and specifically excluding the United Nations Convention on Contracts for the International Sale of Goods."  [STIPULATED]

I.     **Product Use Rights.**

136.     Epic did not breach the license provision set forth in § 1 of the RUO 14.0 license agreement.

137.     Subject to payment of applicable fees, the RUO 14.0 license agreement granted Epic a "non-exclusive, non-transferable license to use the Software for internal business purposes in accordance with the terms of [the] Agreement and the applicable product use rights set forth in the Appendix ('Product Use Rights')."  [STIPULATED]

138.     The RUO 14.0 license agreement provides, "DESKTOP LICENSE:  You must acquire and dedicate a desktop license for each single computer on which the Software is 'used.'"  [STIPULATED]

139.     Under the RUO 14.0 license agreement, "the Software is 'used' when the Software or any component of the Software is installed or loaded in the temporary or permanent memory of a computer or otherwise accessed."

140.     The RUO 14.0 license agreement also provides, "CONCURRENT LICENSE:  You must acquire concurrent licenses for the maximum number of users who will use or access the Software at the same time."  [STIPULATED]

141.     A concurrent license differs from a device license in that it is not tied to a specific computer but can be used by different users/computers at different times. [STIPULATED]

142.     As of July 2015, Epic had used the RUO 14.0 software on 9095 employee and training center workstation devices and on 50 extranet servers used for remote customer training via Citrix.

143.     Epic's use of the RUO 14.0 software on its training center workstation devices and thin clients and extranet servers was for Epic's internal business purposes, specifically the training of Epic customers on Epic's software.

144.     When Epic installed the RUO software on its extranet servers for remote customer training via Citrix, Epic attached the RUO software directly to specific text-based training environments on Epic's internal network and disabled all functions that would have allowed Epic's customers to use the RUO software for any purpose other than training.

145.     Attachmate's customer, Pharmacy Data Management Inc. ("PDMI"), has been using Reflection software to permit PDMI's customers to access PDMI's text-based databases on PDMI's internal network and process insurance claims, produce reports, and modify and adjust insurance plans and patient information since at least 2003.

146.     Attachmate has advertised PDMI's use of Attachmate's software as a client success story that obviously represents appropriate use of the software under the applicable RUO 14.0 license agreement.

147.     The "applicable product use rights" under § 1 of the RUO 14.0 license agreement depend on the specific software being used and how the software is being used.

148.     For device-based usage, the RUO 14.0 license agreement requires device licenses: "**DESKTOP LICENSE**:  You must acquire and dedicate a desktop license for each single computer on which the Software is 'used.'"

149.    For concurrent-based usage, the RUO 14.0 license agreement requires concurrent licenses: "**CONCURRENT LICENSE**:  You must acquire concurrent licenses for the maximum number of users who will use or access the Software at the same time."

150.    Epic's use of the RUO 14.0 software on its employee and training center workstations and thin clients was regular and consistent, and Epic purchased 10,930 device licenses which were more than sufficient to cover that usage.

151.    A small number of Epic's customers' employees access terminal emulation software, such as RUO 14.0 software, on Epic's extranet servers, via Citrix, for remote training and those users' access ebbs and flows throughout the year, and Epic therefore purchased 400 concurrent licenses to cover that particular usage.

152.    Epic intentionally purchased concurrent licenses for remote customer training via Citrix because it would not make economic or business sense for Epic to have purchased individual device licenses for each customer's users who would be granted permission to access text-based training environments that required the use of terminal emulation software when it was predictable that only a relatively small number of the total possible users would actually use RUO at a single time.

153.    Attachmate was willing to sell concurrent licenses for remote customer training via Citrix in part because competitors offered similar licenses for products with equivalent functionality.

154.    Concurrent user licenses benefit customers whose peak simultaneous user count is significantly less than the overall potential user count.

155. Epic knew the number of users with the potential to access RUO software remotely on Epic's internal network exceeded by many multiples the number of users that actually would access the RUO software at any given time.

156. It would have been nonsensical to purchase device-based licenses for terminal emulation software for all of the users' devices that might possibly remotely access the text-based environment in Epic's training system.

157. A concurrent license model was the only license model that made any sense for the architecture associated with Epic's customers' employees' usage pattern of terminal emulation software for remote customer training.

158. It would have been cost prohibitive for Epic to use anything other than a concurrent license model to license its use of terminal emulation software to provide remote training services to its customer.

159. Concurrent licenses were the applicable licenses for allowing remote customer connections to text-based environments on Epic's internal network.

160. Epic has always purchased concurrent licenses to terminal emulation software to cover its customers' employees' potential use of text-based environments on Epic's internal network for remote training via Citrix.

161. Originally, Epic purchased concurrent licenses to Esker's SmarTerm software so that customers' employees' could use SmarTerm as the terminal emulation software for remote customer training in text-based environments.

162. Then, in 2011, for remote customer training in text-based environments Epic paid for 400 concurrent RWeb licenses after Attachmate agreed to permit concurrent usage of Attachmate's RUO software for the cost of those RWeb licenses.

163. And then, in 2014, Epic purchased 400 concurrent RUO 14.0 licenses remote customer training in text-based environments after Attachmate disputed its prior agreement permitting concurrent use of Attachmate's RUO software if Epic paid for 400 concurrent RWeb licenses in 2011.

164. In the summer of 2015, Epic began using PuTTY, a free terminal emulation software, for remote customer training in text-based environments on Epic's extranet. [STIPULATED]

165. PuTTY provides functionality equivalent to Attachmate's RUO software and suitable for Epic's needs.

166. Epic did not breach the device license provision of the RUO 14.0 license agreement by using the RUO 14.0 software on its employee and training center workstation devices and "thin clients" because Epic had 10,930 device licenses authorizing device-based use of the RUO 14.0 software and, at its peak, Epic only used the RUO 14.0 software on 10,683 employee and training center workstation devices and "thin clients."

167. Epic's 10,930 device licenses were sufficient to cover every installation and use of the RUO 14.0 software installed and used by Epic employees on Epic-owned devices.

168.    Epic was properly licensed for the RUO 14.0 software installed and used by Epic employees on Epic-owned devices as of December 2014, and it continues to be properly licensed.

169.    Epic did not breach the device license provision of the RUO 14.0 license agreement by allowing remote customer access to the RUO 14.0 software for only training on Epic's internal servers because the device license provision is not applicable to such concurrent-based usage.

170.    Attachmate has no evidence that Epic's customers' employees ever used RUO 14.0 software on devices that were not licensed to use RUO 14.0.

171.    Attachmate has no evidence that Epic's unused device licenses were insufficient to cover any actual usage of the RUO 14.0 software by Epic's customers.

172.    Attachmate has no evidence that Epic's customers did not have applicable device licenses covering any use of RUO 14.0 for remote customer training in text-based environments via Citrix.

173.    Attachmate's audit documents reflect at most a snapshot of how Epic had the RUO software installed on December 17 through December 19, 2014.

174.    The audit data does not identify any computers that used or otherwise accessed the RUO 14.0 software on Epic's extranet servers.

175.    Attachmate's audit does not identify any actual users of Attachmate's software, and it certainly does not identify any actual unlicensed use by any devices.

176.     The list of members of Epic's active directory identified in Attachmate's audit only identifies users with the permission to access training environments on Epic's internal networks.

177.     The users who had permission to access the RUO 14.0 software on Epic's internal servers were predominantly customer employees who had been given permission to remotely access, via Citrix, Epic's internal servers for training.

178.     For each customer, it is possible that more than one employee user could use the same customer computer or device to access, via Citrix, Epic's internal servers for training.

179.     Epic's customers would need to use terminal emulation software to access the text-based environments in the customers' installation of Epic software, and Epic historically recommended Attachmate's Reflection software for that purpose.

180.     The majority of Epic's customers therefore have their own licenses for use of Attachmate's Reflection software.

181.     Epic did not breach the concurrent license provision of the RUO 14.0 license agreement by allowing remote customer access to the RUO 14.0 software for training on Epic's internal network between March 2011 and March 2014 because Attachmate authorized Epic to concurrently use RUO software and the number of users accessing the software at the same time never exceeded the number of concurrent licenses Epic owned at any given time.

182.     Epic did not breach the concurrent license provision of the RUO 14.0 license agreement by allowing remote customer connections to text-based environments

on its internal network after March 2014 because Epic specifically purchased 400

concurrent RUO licenses in March 2014 and concurrent usage never exceeded the

number of concurrent RUO licenses that Epic purchased.

183.    Epic's records indicate that at its peak, the number of its trainees' open

sessions (not users) of the RUO 14.0 software via Citrix was 390.

184.    Because trainee users can, and often do, have multiple RUO sessions open

simultaneously, the actual number of users at that peak was approximately 330 or 340,

but in any event significantly fewer than the 400 concurrent licenses Epic owned at the

time.

## II.    <u>Monitor & Control Requirements</u>

185.    Epic did not materially breach the monitor and control requirements set

forth in the concurrent license provision under § 1 of the RUO 14.0 license agreement.

186.    Under the "Concurrent License" portion of the RUO 14.0 license

agreement's Products Use Right Appendix, it provides that a concurrent licensee is

required to "monitor, control, and (on request of Licensor) report on concurrent usage

by produce and version."  [STIPULATED]

187.    There is no definition or guidance in the RUO 14.0 license agreement as to

what a licensee is required or expected to do to monitor, control or report on concurrent

usage in order to comply with the concurrent license provision of the agreement.

188.    Attachmate drafted the monitor and control provision of the license

agreement and the ambiguity is therefore construed against Attachmate.

189.    Attachmate did not identify specific steps that Epic would be required to take to satisfy the monitor, control and reporting requirements of the concurrent license provision of the RUO 14.0 license agreement.

190.    Attachmate did not discuss with Epic what Attachmate expected Epic to do to monitor, control or report on concurrent usage of the RUO 14.0 software.

191.    Attachmate did not ask Epic what methods it planned to employ to monitor or control concurrent use of the RUO 14.0 software.

192.    Attachmate has an internal policy that requires its sales representatives to obtain a separate Concurrent License Application & Agreement to accompany a concurrent license transaction.

193.    Attachmate's internal policy requires Attachmate to have a concurrent licensee complete the additional application and agreement, apparently to ensure that controls that Attachmate deemed appropriate were put in place for compliance and to make sure the licensee confirmed the methods it intended to use to monitor and control concurrent usage.

194.    Attachmate never had Epic complete a Concurrent License Application & Agreement.

195.    64.    Attachmate never requested that Epic complete or sign a Concurrent License Application or Agreement. [STIPULATED]

196.    Attachmate never discussed a Concurrent License Application or Agreement with Epic.

197.    The RUO 14.0 license agreement provides Epic with discretion as to how to "monitor, control, and (on request of Licensor) report on concurrent usage by product and version."

198.    Epic has, since it first installed RUO 14.0 on its extranet in March 2011, monitored and controlled concurrent usage under its concurrent terminal emulation software licenses.

199.    Epic has a software licensing team whose responsibilities include monitoring, controlling and reporting on the use of software in compliance with licensing agreements.

200.    There is a multitude of different ways in which concurrent usage of software might be effectively monitored and controlled depending on the licensee's circumstances.

201.    Attachmate's internal policy notes that to control software a licensee may use "a blend of technological methods and business policies, so long as they are effective."

202.    Epic employed the same methods to monitor and control concurrent usage of the RUO 14.0 software that it employed to monitor and control usage of other concurrently licensed software, such as SmarTerm.

203.    Just as it had done with monitoring concurrent usage of SmarTerm (the software that the RUO 14.0 software replaced) by its remote trainees, Epic used the Citrix Delivery Services console to perform real-time monitoring and control of concurrent RUO license usage throughout each business day.

204.     Epic's use of the Citrix Delivery Services console and manual review of the number of users accessing Epic's text-based training environment at the same time was an effective way to monitor and control usage.

205.     Epic's employees responsible for monitoring concurrent connections are very confident, based on their monitoring efforts, that there have never been more than 400 remote users accessing the RUO software concurrently on Epic's internal network at any point.

206.     After Epic removed RUO 14.0 from its internal servers and replaced it with PuTTY in 2015, it has continued to monitor the peak number of users accessing terminal emulation software for remote training and that peak number has not exceeded 400 even though the total number of customers has increased since this lawsuit began.

207.     Other potential, available methods of monitoring and controlling concurrent use of the RUO 14.0 software would not have worked in Epic's circumstances.

208.     For example, there is a "limit" function in Attachmate's RUO software that allows a licensee to limit the number of users that can access a particular instance (installation) of the RUO 14.0 software.

209.     The "limit" feature of the RUO 14.0 software would allow a licensee, to limit concurrent users only if there was only a single instance of the RUO 14.0 software.

210.     The "limit" feature could not have worked for Epic as a way to monitor and control concurrent use of the RUO 14.0 software.

211.    Epic did not and could not publish only a single instance of the RUO 14.0 software for remote customer training via Citrix.

212.    Epic published multiple instances at any one time (typically around 20, but up to 50) of the RUO 14.0 software, each of which was attached to a specific text-based training environment and could therefore only be used to access that specific individual training environment as a way to control use.

213.    Had Epic tried to use the "limit" feature of the RUO 14.0 software, Epic could not have disabled the functions in the way that Epic did when it installed the RUO 14.0 software to ensure that trainees could use it only to access the text-based training environments on which the RUO 14.0 software was attached and prevent such trainees from using the RUO 14.0 software for any other purpose.

214.    Any attempt by Epic to use the "limit" feature to try to cap users of any instance of the RUO 14.0 software would have been ineffective because each "limit" works only on its own instance of the software and does not limit users on the other instances.

215.    If Epic had entered 400 as the "limit" for each instance, that would not have been an effective cap because up to 400 users still would have had access to each of the multiple instances available at any given time.

216.    Epic could not have allocated the 400 licenses among the different instances of the RUO 14.0 software it published, because there was not an even or predictable distribution of users for each such instance.

217.     On any one day, a particular training environment on which the RUO 14.0 software was published might have 3 users, and a second environment might have 100 users, and the next day, the numbers might be reversed.

218.     Epic used a much more effective approach to monitor all concurrent connections to all instances of the RUO 14.0 software to ensure that the number of users accessing the software at the same time did not exceed the 400 concurrent licenses Epic had purchased.

219.     Epic's effort to monitor and control concurrent RUO usage was reasonable in light of its circumstances and industry practice and did not deprive Attachmate of any benefit of its bargain under the RUO 14.0 license agreement.

220.     Attachmate never requested that Epic report on concurrent usage, so Epic's duty to report was never triggered.

221.     Epic's training schedule determines when Epic's trainees will remotely access its text-based training environments via Citrix, which results in a usage pattern that is predictable for Epic.

222.     Epic's employees would more closely monitor the number of external Citrix sessions during periods where heavy waves of on-site training had just ended, and then Epic's employees would count the specific number of those sessions engaged in a text-based training environment to determine the peak number of users using the RUO 14.0 software at the same time.

223. As of March 2011, Epic had 1,325 concurrent Citrix licenses that could be used, in part, so that customers' employees could remotely access Epic's internal servers for training.

224. The Citrix licenses Epic owned were shared by the users engaged in on-site training, and the extranet.

225. Epic's extranet contains the text-based environments on which RUO 14.0 was installed for customer training, but the majority of the extranet is non-text based environments that do not require a terminal emulator.

226. In April 2011, Epic purchased an additional 400 concurrent Citrix licenses, at a cost of $261 per license, because of the growth in the number of its customers' employees' using Citrix to remotely access Epic's internal servers for training, bringing Epic's total number of concurrent Citrix licenses to 1,725.

227. As of August 2014, Epic had 1,925 concurrent Citrix licenses.

228. In August 2014, Epic purchased 400 more concurrent Citrix licenses at a cost of $261 a license, bringing Epic's total number of concurrent Citrix licenses to 2,325 as of the audit.

229. Since this lawsuit began, Epic has increased its customer base, which includes increasing the number of customer-employees that train remotely via the extranet.

230. In late 2015, Epic created a program that, every five minutes, obtains a read-out of the number of users actually remotely accessing, via Citrix, Epic's text-based training environments on Epic's internal extranet servers.

231.     From January 2016 – April 2016, the number of users  remotely accessing, via Citrix, Epic's text-based training environments on Epic's internal extranet servers at the same time has never exceeded 400.

232.     Epic average monthly customer trainees were higher over the period of January 2016 to April 2016 than any period before then.

## III.     Safeguards & Record Keeping Requirements

233.     Epic did not breach the safeguards and record keeping requirements set forth in § 4 of the RUO 14.0 license agreement.

234.     Under § 4 of the RUO 14.0 license agreement, licensees are required "to implement internal safeguards to prevent any unauthorized copying, distribution, or use of the Software" and "keep records relating to the Software products you have installed, copied or used."  [STIPULATED]

235.     The RUO 14.0 license agreement does not define the terms "internal safeguards" or "records," nor does it provide any examples.

236.     The RUO 14.0 license agreement does not require implementation of any specific safeguards or maintenance of any specific records.

237.     Attachmate never requested that Epic implement any specific safeguards or maintain any specific records under the RUO 14.0 license agreement.

238.     The RUO 14.0 license agreement grants Epic discretion as to what internal safeguards to implement and records to keep.

239. Epic made the RUO 14.0 software available to its customers for training purposes by attaching it directly to specific text-based training environments on Epic's internal network.

240. Epic's customers had no ability to use the RUO 14.0 software that Epic published on text-based environments on its internal networks to access any other environments, whether on Epic's internal network or anywhere else.

241. Epic used the security group functionality of its Active Directory to assign security permission to only those Epic customers who would need access to the environments on which the RUO 14.0 software was published.

242. Epic maintained records regarding the type of licenses it was purchasing and the number of RUO software licenses it owned, including its regular purchase of additional licenses as the company grew.

243. Epic also maintained records regarding how and where it installed the RUO software.

244. It was, and still is, not technologically possible for Epic to have kept records of every device that accessed terminal emulation software, including RUO 14.0, that Epic had published on the extranet for customer training as the best possible efforts could only obtain user ID and IP addresses, neither of which tell what device accessed the software.

245. Epic's internal safeguards and record keeping practices were reasonable in light of its circumstances and industry practice and did not deprive Attachmate of any benefit of its bargain under the RUO 14.0 license agreement.

246.    Attachmate has not identified a particular record that it had informed Epic it needed to create and maintain that Epic failed to create and maintain.

## IV.    Damages

247.    Epic would never have agreed to purchase licenses from Attachmate if a provision in the applicable license agreement required Epic to pay for device licenses for all potential, not even actual, concurrent users of the RUO 14.0 software.

248.    No reasonable party in Epic's position would have agreed to purchase licenses from Attachmate if a provision required it to pay for device licenses for all potential concurrent users of the RUO 14.0 software.

249.    Rather than purchase device licenses for all potential concurrent users of the RUO 14.0 software, Epic would have either continued to use the terminal emulator product it had been using for remote customer connections to text-based environments (Smart-Term), or it would have done what it has now done, which is switch to a zero-cost alternative product, PuTTY, or another product from a different vendor.

250.    Assuming a breach, the proper measure of damages is the difference between the price Epic paid for 400 concurrent RWeb licenses in 2011 and the price Epic would have paid for 400 concurrent RUO licenses in 2011, which is informed by the actual amount that Attachmate charged Epic for 400 concurrent RUO licenses in March 2014.

251.    At most, Epic would have paid approximately $47,000 for 200 concurrent RUO licenses in March 2011 and approximately $48,000 for 200 additional RUO licenses in September 2011, totaling approximately $95,000.

252.     The total amount Epic would have paid—approximately $95,000—for concurrent RUO licenses in 2011 is less than the $153,800 Epic collectively paid Attachmate in March 2011, September 2011, and March 2014 for the 400 concurrent RWeb and RUO licenses.

253.     Accordingly, under the proper measure of damages, Attachmate's damages are zero.

254.     Epic's use of the RUO software for remote customer connections to text-based training environments was the same from March 2011 to March 2014, as it was after March 2014.

255.     Attachmate has known for years, since before Attachmate agreed to sell Epic concurrent licenses, that Epic's purpose for buying concurrent licenses was to permit its trainees, comprised of customers and consultants, to use RUO 14.0 to conduct training on the use of Epic's software by remotely accessing text-based training environments on Epic's internal network via Citrix.

256.     When Epic purchased licenses in 2011, Attachmate provided a quote that broke down the licenses into two separate categories, those for use by Epic's employees and in Epic's on-site training center (device based licenses) and those used for remote training of Epic's customers after on-site training was over (concurrent licenses).

257.     Attachmate was aware as early as February or March 2011 that Epic had been using SmarTerm terminal emulation software concurrently, and that other solutions, such as PuTTY were being considered by Epic.  [STIPULATED]

258.     Attachmate's sales representative for Epic, Bob Babai, confirmed that when he sold Epic concurrent licenses in March 2011 he knew that Epic would use those licenses to allow remote customer trainees to access Reflection software on text-based environments on Epic's internal network.

259.     Mr. Babai had a reasonable opportunity to discover how Epic was using Attachmate's software to remotely train its customers, as Mr. Babai regularly spoke with Epic's staff regarding Epic's use of Reflection software by employees, for on-site training and off-site or remote training.

260.     Epic was one of Mr. Babai's top 20 customers, and he made a point of trying to visit Epic's facility annually to understand Epic's needs and software uses.

261.     Attachmate had a reasonable opportunity to discover how Epic was monitoring and controlling concurrent usage of Attachmate's software had it simply asked.

262.     Epic relied on Attachmate's silence regarding its expectations for monitoring and controlling concurrent usage and reasonably applied its own methods to monitor and control believing Attachmate had no particular requirements or preferences that would be imposed during or after an audit to support an allegation of breach.

## THE RUO 14.1 LICENSE AGREEMENT

263.     Epic did not breach the RUO 14.1 license agreement.

264.     Epic owns 5,600 device licenses that allow Epic to use RUO 14.1.

265. Epic's use of the RUO 14.0 software on 10,683 employee and training center workstation devices and "thin clients" leaves Epic with 247 available device licenses to cover Epic's device-based usage of the RUO 14.1 software.

266. Epic has only used the RUO 14.1 software on 22 employee workstation devices.

267. Epic did not breach the RUO 14.1 license agreement by using the RUO 14.1 software on its employee workstation devices because Epic had 5600 device licenses authorizing device-based use of the RUO 14.1 software and Epic only used the RUO 14.1 software on 22 employee workstation devices.

268. Epic's 5600 device licenses were sufficient to cover every installation and use of the RUO 14.1 software installed and used by Epic employees on Epic-owned devices.

269. Epic was properly licensed for the RUO 14.1 software installed and used by Epic employees on Epic-owned devices as of December 2014, and it continues to be properly licensed.

**THE EX V. 9.3 LICENSE AGREEMENT**

270. Epic did not breach the EX v. 9.3 license agreement

271. Epic has only downloaded an evaluation version of the EX v. 9.3 software.

272. Epic only used EX v. 9.3 to evaluate use of the software.

273. The EX v. 9.3 license agreement authorizes use of evaluation versions of the EX v. 9.3 software for "test and evaluation purposes" over a period of time, which extends from the "first installation of the Software to the earlier of (i) the date when the

Evaluation version automatically ceases to function, or (ii) sixty (60) days after [the] first installation."

274. Attachmate gave away evaluation versions of the EX v. 9.3 software to potential customers to evaluate the software to determine whether they wanted to buy a license.

275. Evaluation versions of the EX v. 9.3 software stop working after a 60-day evaluation period.

276. Attachmate has no evidence that the EX v. 9.3 software found on Epic's system was functional.

277. Attachmate has no evidence that Epic ever used the EX v. 9.3 software beyond downloading it let alone beyond the sixty day trial period.

278.    Dated this 18th day of July, 2016.

**MICHAEL BEST & FRIEDRICH LLP**

By:   _s/ S. Edward Sarskas_
       S. Edward Sarskas, SBN 1025534
       Patricia L. Jenness, SBN 1082658
       100 East Wisconsin Avenue, Suite 3300
       Milwaukee, WI  53202
       Phone:  414.271.6560
       Fax:  414.277.0656
       sesarskas@michaelbest.com
       pljenness@michaelbest.com

       Ian A. J. Pitz, SBN 1031602
       Albert Bianchi, Jr., SBN 1056920
       1 S. Pinckney Street, Suite 700
       Madison, WI  53703
       Phone:  608.257.3501
       Fax:  608.283.2275
       iapitz@michaelbest.com
       abianchi@michaelbest.com

       _Attorneys for Plaintiff Epic Systems Corporation_